FILED
IN CLERKS OFFICE
2026 OCT 23 A 10: 53
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHIVA AYYADURAI, Candidate for United States Senate, *Plaintiff,* *v.* BELMONT NEWS FOUNDATION, INC, (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO, *Defendants.* | Civil Action No. 1:26-cv-14760-ADB<br>COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF, BREACH OF CONTRACT, PROMISSORY ESTOPPEL, MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L c. 12, § 11H), AND UNFAIR TRADE PRACTICES (M.G.L. c. 93A)<br>JURY TRIAL DEMANDED |

**PLAINTIFF'S COMPREHENSIVE SUPPLEMENTAL MEMORANDUM OF LAW AND SUPPORTING DECLARATIONS REGARDING PROMISSORY ESTOPPEL, OPERATIONAL RELIANCE, AND EQUITABLE RELIEF**

## INTRODUCTION

Plaintiff Dr. Shiva Ayyadurai, proceeding *pro se*, submits this Comprehensive Supplemental Memorandum of Law and accompanying sworn Declarations (Exhibits A–C) in support of his Emergency Motion for a Temporary Restraining Order and Preliminary Injunction under Fed. R. Civ. P. 65. In a public letter to readers dated October 22, 2026 (Exhibit D), Defendants attempt

to reframe this dispute as a First Amendment prior-restraint issue governed by *Miami Herald Publishing Co. v. Tornillo*. That defense is contrary to controlling United States Supreme Court precedent. Under *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), the First Amendment does not grant news publishers immunity from generally applicable state laws of contract and promissory estoppel. When a publisher makes an enforceable commitment that foreseeably induces real-world, detrimental operational forbearance, equity will hold the publisher to its word.

The sworn evidentiary record establishes an unambiguous written agreement, binding federal statutory definitions of candidate parity, an established organizational routine practice under Fed. R. Evid. 406, verifiable operational forbearance in Belmont, and an *ex post facto* pretextual breach during active general election mail-in voting.

## ARGUMENT

### I. *Cohen v. Cowles Media Co.* Precludes First Amendment Immunity for Broken Contractual Promises

Defendants cannot shield their broken promise behind *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974). *Tornillo* struck down a state statute imposing a blanket, government-mandated "right of reply" on private, commercial newspapers absent any underlying consensual agreement. In sharp contrast, this action is controlled by the Supreme Court's definitive ruling in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991). In *Cohen*, the Supreme

Court squarely held that "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." *Id.* at 672. When a news organization voluntarily enters into an agreement that induces detrimental reliance, generally applicable state doctrines of contract and promissory estoppel apply to the press just as they apply to any other commercial or corporate enterprise.

Plaintiff does not seek government censorship, content regulation, or judicial oversight of abstract news judgment. Plaintiff seeks the equitable enforcement of a specific, voluntary, written commitment executed by Defendant Floyd on August 26, 2026, under generally applicable Massachusetts common law.

**II. The Legal Identity of the Parties Defines "Coverage" as Strict Non-Partisan Parity**

Defendants contend that Defendant Floyd's written commitment that "our coverage will expand to include other candidates" gave them unbounded discretion to publish an extensive, dedicated feature profile on Republican candidate John Deaton while constructively excluding Plaintiff. Under Massachusetts contract law, that position fails as a matter of law.

Words in a contract do not exist in a vacuum; they derive their meaning from the regulatory context and the legal status of the contracting parties. *Restatement (Second) of Contracts* § 202.

Most critically, Massachusetts law requires that contracts be construed to reflect a **lawful**

**purpose** rather than an unlawful one. *Shea v. Bay State Gas Co.*, 383 Mass. 218, 222 (1981); *Restatement (Second) of Contracts* § 203(a).

Defendant Belmont News Foundation is an IRS-chartered **501(c)(3) tax-exempt public charity**. Unlike commercial, for-profit media outlets such as *The Boston Globe*, Fox News, or CNN—which operate with private editorial discretion—a 501(c)(3) non-profit is strictly bound by federal statutory non-intervention mandates:

1. **The Constitutional Principle:** In *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), the Supreme Court held that the statutory ban on political campaign intervention by 501(c)(3) organizations is fully constitutional, establishing that non-profit tax exemption is an explicit trade: federal tax-deductible subsidies in exchange for an absolute surrender of partisan campaign activity. The D.C. Circuit reaffirmed in *Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000), that 501(c)(3) entities possess zero First Amendment entitlement to use tax-exempt resources to intervene in candidate elections.
2. **The Administrative Standard of Parity:** The Internal Revenue Service has explicitly defined how candidate "coverage" must be provided by a 501(c)(3) entity:
    - **IRS Revenue Ruling 86-95:** When a 501(c)(3) provides a forum or public exposure for political candidates, it retains its tax status only if all qualified candidates are provided an equal opportunity to participate.
    - **IRS Revenue Ruling 80-282:** Candidate profiles and guides violate federal law unless they cover all candidates with equal prominence.

- **IRS Revenue Ruling 2007-41:** Candidate profiles, questionnaires, and website postings must provide **equal presentation and distribution** to all qualified candidates. Deploying non-profit assets to profile one candidate while suppressing another constitutes unlawful candidate intervention.

If Defendant Floyd's written commitment of "coverage" were interpreted to mean granting thousands of dollars of free publicity to Republican John Deaton while blacking out Plaintiff Dr.SHIVA, the agreement would constitute an unlawful campaign intervention under 26 U.S.C. § 501(c)(3). Under *Shea*, this Court must interpret the contract lawfully. Therefore, as a matter of law, when an IRS 501(c)(3) non-profit promises general election candidate coverage, that agreement objectively and legally means **equal, non-partisan coverage.**

**III. Plaintiff Has Article III Standing Based on Competitive Electoral Injury and Forbearance**

Defendants cannot avoid equity by asserting that Plaintiff's injuries are speculative. In *Fulani v. League of Women Voters Education Fund*, 882 F.2d 621, 624–26 (2d Cir. 1989), the Second Circuit squarely held that a ballot-qualified candidate suffers an immediate, palpable, and concrete Article III injury when a 501(c)(3) civic organization provides media exposure to major-party candidates while excluding other candidates, because such exclusion inflicts a direct competitive injury in the electoral arena.

Furthermore, Plaintiff's injury is heightened beyond abstract electoral competition: Plaintiff suffered direct, tangible **operational forbearance** under Massachusetts promissory estoppel. In direct reliance on Defendants' written word, Plaintiff physically withdrew his campaign field workers and ceased direct voter leafleting in Belmont during the irreversible window of early voting. That operational sacrifice represents an immediate, irreparable injury.

**IV. Verifiable Operational Detrimental Reliance Under Fed. R. Evid. 406**

Under Massachusetts law, a promise is binding under promissory estoppel when the promisor should reasonably expect to induce action or forbearance of a definite and substantial character, and which does induce such action or forbearance. *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 760 (1978). The reliance need not be commanded by the promisor; it need only be **foreseeable.** *Id.*

The sworn record establishes that Plaintiff's reliance was concrete, physical, and operational. Plaintiff represents the 65% independent, unenrolled majority in Massachusetts and operates without corporate PAC funds. The campaign's sole voter-contact engine is targeted volunteer flyer distribution. Because personnel and resources are finite, the campaign manages field operations with mathematical discipline through nightly 7:00 PM operational briefings.

Under **Federal Rule of Evidence 406,** Plaintiff establishes an invariable routine practice:

- When broadcast station WWLP in Springfield granted earned coverage, the campaign's 7:00 PM directive was immediate: volunteers were pulled from Springfield leafleting to conserve resources.
- When local radio in Fitchburg scheduled candidate coverage, the 7:00 PM directive was identical: street leafleting in Fitchburg was halted and workers were redeployed.

On August 26, 2026, when Defendant Floyd executed his written promise confirming general election coverage, Plaintiff executed that exact routine practice (Exhibits A and B). At the nightly 7:00 PM briefing, Campaign Manager Nicholas Lupo announced that *The Belmont Voice* - which reaches 10,000 households in Belmont—had locked in coverage. In direct, reasonable reliance on that promise, Mr. Lupo directed Field Director Barbara Herda to halt ongoing volunteer leafleting outside the Belmont grocery store and to reallocate field organizers Noel Arellano and Ms. Herda away from Belmont to other towns across the Commonwealth. Plaintiff physically surrendered his ground game in his home town of 45 years because the town newspaper gave its written word.

**V. Defendants' "Suffolk Poll" Defense Is an *Ex Post Facto* Pretext Under the Implied Covenant of Good Faith**

Under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing, ensuring that neither party shall do anything that destroys or injures the right of the other

party to receive the fruits of the contract. *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471 (1991).

In their public statement of October 22, 2026 (Exhibit D), Defendants attempt to excuse their breach by asserting that Plaintiff was polling at 1% in an October 2026 Suffolk University poll. This defense collapses upon chronological inspection:

- Defendant Floyd issued his unconditional written commitment on **August 26, 2026.**
- Defendants published their expansive, dedicated profile on Republican John Deaton in **September 2026.**
- Defendants stonewalled Plaintiff's scheduling requests on **September 25 and 26, 2026.**
- **The Suffolk University poll was not conducted or published until mid-October 2026.**

Defendants cannot commit a breach in August and September, and then reach forward into mid-October to manufacture an *ex post facto* pretext. Furthermore:

1. **Rigged Metric:** In that very Suffolk survey, nearly 45% of voters statewide had never heard of John Deaton, whereas Plaintiff possesses statewide name recognition exceeding 80%. Suffolk University omitted Plaintiff from favorability batteries and disabled ballot-question randomization. In contrast, the scientific UMass Amherst poll demonstrates Plaintiff capturing over 15% of the independent electorate.
2. **Hyper-Local News Duty:** *The Belmont Voice* circulates exclusively in the Town of Belmont, where over 12,000 independent voters reside. Plaintiff has lived in Belmont for 45 years. For a hyper-local paper to cite an external statewide poll to black out its own

45-year resident while profiling an outsider who does not live in Belmont demonstrates bad-faith candidate gatekeeping.

3. **Pretextual Questionnaire:** Stalling Plaintiff for seven weeks while early voting commenced, and then sending an email on October 14 asking Plaintiff why he selected the **"state senate"** as his target (Complaint, Figure 4), confirms bad-faith pretext.

## VI. Irreparable Harm and Tailored Rule 65 Equitable Remedies

The First Circuit and the Supreme Court have repeatedly recognized that the loss of political speech and candidate access during an active election constitutes irreparable harm. Mail-in voting and early voting in Belmont is actively occurring right now. Once a voter casts a ballot without exposure to Plaintiff's candidacy, that vote is final. Post-election monetary damages cannot re-run a federal election.

If this Court hesitates to order an expansive narrative profile, equity provides immediate, content-neutral, tailored remedies under Fed. R. Civ. P. 65:

1. **Specific Performance of Questionnaire:** Order Defendants to immediately publish Plaintiff's written answers to the four questions submitted by Defendant Floyd on October 14, 2026, corrected to reflect Plaintiff's candidacy for the United States Senate.
2. **Homepage Factual Clarification:** Order Defendants to post a prominent factual notice on the homepage of *The Belmont Voice* stating that Dr. Shiva Ayyadurai is an officially

certified candidate for the United States Senate residing in Belmont.

3. **Document Preservation:** Order Defendants to preserve all internal editorial communications, notes, and correspondence regarding candidate coverage decisions for the 2026 general election.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

DATED: October 20, 2026

RESPECTFULLY SUBMITTED,

Dr. Shiva Ayyadurai,
*Plaintiff* Pro Se
701 Concord Avenue
Cambridge, MA 02138
E: vashiva@cytosolve.com