**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br><br>Plaintiff,<br><br>v.<br><br>BELMONT NEWS FOUNDATION, INC. (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO,<br><br>Defendants. | Case No. 1:26-cv-14760-DLC |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO COMPEL PUBLICATION**

DAVIS WRIGHT TREMAINE LLP
Rachel F. Strom
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Telephone: (212) 603-6455
Fax: (212) 489-8340
RachelStrom@dwt.com

*Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 3

A. The Parties ........ 3

B. *The Belmont Voice*'s Election Coverage........ 3

C. Plaintiff Demands Coverage From *The Belmont Voice* With Increasing Aggression ........ 4

D. This Lawsuit........ 6

ARGUMENT ........ 6

II. Plaintiff has no Likelihood of Success on the Merits ........ 9

A. Plaintiff Has No Valid Breach of Contract Claim ........ 9

B. Plaintiff Has No Valid Promissory Estoppel Claim ........ 11

C. Plaintiff Has No Valid Civil Rights Claim Pursuant to the Massachusetts Civil Rights Act (M.G.L. c. 12, § 11H/I)........ 12

D. Plaintiff Has No Valid Unfair and Deceptive Trade Practices Claim Pursuant to M.G.L. c. 93A ........ 13

III. Plaintiff Cannot Demonstrate Irreparable Harm ........ 15

IV. The Balance of Hardships Weighs Heavily in Favor of Defendants ........ 17

V. The Public Interest Strongly Favors Defendants ........ 19

CONCLUSION........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affleck v. Harvard Crimson, Inc.*,
2025 WL 330577 (D. Mass. Jan. 29, 2025),
*appeal filed* (25-1223) (1st Cir. Mar. 5, 2025) ....7, 18

*Ayyadurai v. Floor64, Inc.*,
No. 1:17-cv-10011-FDS (D. Mass. Sept. 6, 2017) ....2

*Ayyadurai v. Galvin*,
2026 WL 2409465 (D. Mass. Aug. 18, 2026) ....2, 9, 16

*Ayyadurai v. Gawker Media, LLC et al.*,
No. 1:16-cv-10853 (D. Mass. May 10, 2016)....2

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....18

*Bourgault v. Halben*,
2026 WL 1410725 (Mass. Ct. App. May 20, 2026) ....10

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010)....8, 15

*Brunette v. Humane Soc'y of Ventura Cnty.*,
294 F.3d 1205 (9th Cir. 2002) ....17

*Chiodini v. Target Mktg. Grp., Inc.*,
58 Mass. App. Ct. 376 (2003)....14

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)....12

*Cummings v. City of Newton*,
298 F. Supp. 3d 279 (D. Mass. 2018) ....12, 13

*Elrod v. Burns*,
427 U.S. 347 (1976)....18

*Esso Standard Oil Co. v. Monroig–Zayas*,
445 F.3d 13 (1st Cir. 2006) ....8

*Fulani v. Brady*,
935 F.2d 1324 (D.C. Cir. 1991) ....9

*Garrison v. Louisiana*,
379 U.S. 64 (1964) .......... 19

*Gerli v. G.K. Hall & Co.*,
851 F.2d 452 (1st Cir. 1988) .......... 15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 7

*In re Daniel*,
568 B.R. 162 (Bankr. D. Mass. 2017) .......... 14

*Kuzmeskus* v. *Pickup Motor Co.*,
330 Mass. 490 (1953) .......... 10

*LJA Corp. v. Farace*,
1995 WL 808668 (Mass. Super. Mar. 14, 1995) .......... 14

*Lugosch v. Pyramid Co. of Onondaga*,
435 F.3d 110 (2d Cir. 2006) .......... 18

*Malden Police Patrolman's Ass'n v. Malden*,
92 Mass. App. Ct. 53 (2017) .......... 11

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 16

*Menzone v. Menzone*,
2003 Mass. App. Div. 161 (2003) .......... 10

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) .......... *passim*

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) .......... 18

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) .......... 19

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973) .......... 7

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
366 Mass. 593 (1975) .......... 14

*R.I. Hosp. Tr. Nat'l Bank v. Varadian*,
419 Mass. 841 (1995) .......... 11

*Redgrave v. Bos. Symphony Orchestra, Inc.*,
855 F.2d 888 (1st Cir. 1988)....13

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005)....15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)....15

*TechTarget, Inc. v. Spark Design, LLC*,
746 F. Supp. 2d 353 (D. Mass. 2010)....11

*Unum Grp. v. Benefit P'ship, Inc.*,
938 F. Supp. 2d 177 (D. Mass. 2013)....9

*White v. Bos. Phoenix, Inc.*,
1993 WL 818707 (Mass. Super. Nov. 23, 1993)....14

*Winter v. Nat. Res. Def. Council, Inc*.,
555 U.S. 7 (2008)....8, 19

*Yes for Life Political Action Comm. v. Webster*,
74 F. Supp. 2d 37 (D. Me. 1999)....19

**Statutes**

26 U.S.C. § 501(c)(3)....9, 15, 18

M.G.L. c. §§ 93A *et seq*....6, 13, 14

Mass. Gen. Laws Ann. Chapter 12,
§§ 11 *et seq*....6, 12

Defendants Belmont News Foundation, Inc., publisher of *The Belmont Voice* (or "*The Voice*"), Jesse A. Floyd, and Sarah Caputo ("Defendants"), by and through their undersigned attorneys, submit this memorandum of law in opposition to the motion of Plaintiff Dr. Shiva Ayyadurai ("Plaintiff" or "Dr. Ayyadurai") seeking a temporary restraining order and preliminary injunction forcing Defendants to publish and feature articles concerning Plaintiff's candidacy for United States Senate.

**PRELIMINARY STATEMENT**

This action is premised upon Plaintiff's unfounded belief that he is entitled to dictate the editorial decisions of an independent news outlet. His causes of action are not only meritless, they seek relief flatly prohibited by the First Amendment. Indeed, the Supreme Court has confirmed this, explicitly rejecting a "right of reply" law designed to provide "equal space" to candidates and holding that "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment…[,]" and that "governmental regulation of this crucial process [cannot] be exercised consistent with First Amendment guarantees of a free press." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Plaintiff seeks far more than the candidate in *Tornillo*, demanding that the Court commandeer *The Belmont Voice* to conduct partisan campaigning in his favor, even as his Complaint alleges such a use of a 501(c)(3) nonprofit is prohibited. But even if the requested relief was not in direct contravention of the First Amendment, Plaintiff cannot meet any requirement for the extraordinary remedy of a preliminary injunction.

*First*, none of Plaintiff's claims are likely to succeed. All his claims are premised on a single email stating *The Belmont Voice*'s intention to publish coverage of third-party Senate candidates ahead of the general election. This was not a contract, a binding promise, or the basis

for any other kind of civil liability. And even if it were, *The Belmont Voice* held up its end by seeking an interview from Plaintiff, which Plaintiff rejected in favor of filing this suit. *Second*, Plaintiff has shown no cognizable harm, much less irreparable harm, he will suffer absent his requested relief, because the relief is constitutionally barred and, in any event, cannot plausibly turn the Senate race in his favor. *Finally*, the balance of equities and public interest weigh heavily in favor of Defendants, as the damage they would suffer from a deprivation of their constitutional rights, and to their professional reputations as a result, cannot be undone.

Plaintiff's frivolous arguments come as no surprise, and follow his pattern of abusing the legal system to try to obtain press coverage and personal outcomes he has not earned. Plaintiff has filed at least two meritless defamation actions against technology news outlets Gizmodo and TechDirt for daring to question his claims that he invented email. *See Ayyadurai v. Floor64, Inc.*, No. 1:17-cv-10011-FDS (D. Mass. Sept. 6, 2017); *Ayyadurai v. Gawker Media, LLC et al.*, No. 1:16-cv-10853 (D. Mass. May 10, 2016). And just this year, this Court denied Plaintiff's appeal of an order denying his motion for preliminary injunction arising out of his claim that the November 2020 senate primary race—in which he lost by between 40 and 60 percent of the vote in all but one Massachusetts county—was fraudulent. *See Ayyadurai v. Galvin*, 2026 WL 2409465, at *1 (D. Mass. Aug. 18, 2026). The federal court system is not a tool of abuse and coercion, and Plaintiff's attempts to use it to enact his will upon independent press and voters must be rejected.

In short, this action is inimical to the First Amendment. Plaintiff is entitled to none of his requested relief, even on an interim basis, and his motion should be denied.

## STATEMENT OF FACTS

### A. The Parties

Defendant Belmont News Foundation, Inc. is a Massachusetts nonprofit corporation that publishes the local newspaper and digital outlet[1] *The Belmont Voice*. Dkt. 1 ("Compl.") ¶ 3; Declaration of Jesse A. Floyd ("Floyd Decl.") ¶ 3. *The Belmont Voice* mainly covers the town of Belmont, Massachusetts, including municipal government, education, business, and public safety, and also publishes features on local residents and events. *Id*. ¶¶ 3-4. It will occasionally publish stories that affect a broader geographical area. *Id*. Defendant Jesse A. Floyd is the paper's Editor-in-Chief, and Defendant Sarah Caputo is its Board Chair. *Id*. ¶¶ 1, 7.

Plaintiff Dr. Shiva Ayyadurai is a Belmont resident and an Independent candidate for United States Senate in Massachusetts. Compl. ¶ 1.

### B. *The Belmont Voice*'s Election Coverage

While *The Belmont Voice* generally focuses on local elections, in 2026 it decided to allot some coverage to Massachusetts' statewide Senate campaign. The paper developed a plan for phased coverage. First, the *Voice* interviewed candidates in primary races where incumbents were facing challenges from within their party, including democratic primary opponents Senator Ed Markey and Rep. Seth Moulton. Floyd Decl. ¶ 6. After the primaries, it published an interview with the Republican nominee John Deaton, who had not faced a primary challenge and thus was not included in *The Belmont Voice*'s primary coverage. *Id.* The *Voice* then planned to seek interviews with lower polling third party candidates, including Joseph Tache and Plaintiff Shiva Ayyadurai, with a focus on their reasons for running third party campaigns. *Id*.

[1] https://belmontvoice.org/ (last visited Oct. 23, 2026).

### C. Plaintiff Demands Coverage From *The Belmont Voice* With Increasing Aggression

Plaintiff Dr. Shiva Ayyadurai is a Belmont resident and an Independent candidate for United States Senate in Massachusetts. Compl. ¶ 1. On August 21, 2026, after seeing a primary season interview of Senator Ed Markey in *The Belmont Voice*, Plaintiff called the paper and left a voicemail complaining about having not been interviewed. Floyd Decl. ¶ 7. On August 26, 2026, Defendant Jesse Floyd emailed Plaintiff, explaining: “Tuesday is a primary election, and our coverage was focused on candidates facing primary challenges. When we get to the general election, our coverage will expand to include other candidates.” *Id.*; Compl. ¶ 9 & Fig. 1. Plaintiff replied “Sounds good,” and directed Mr. Floyd to his campaign manager and communications director “to setup [an] interview.” *Id.* Mr. Floyd responded: “Thanks much. It will be a week or a bit longer after the primary for us to get sorted.” *Id.* ¶ 10 & Fig. 1. That is the entirety of the exchange on which Plaintiff’s contract and promissory estoppel claims rest. *See id.* ¶¶ 22-28.

On September 25, 2026, several weeks after primary elections, *The Belmont Voice* published an article about Republican Senate candidate John Deaton, who was trailing in the polls but had shown himself to be a serious candidate in past races. Compl. ¶ 11; Floyd Decl. ¶ 6. At approximately 8:30 on that Friday night, Plaintiff emailed Mr. Floyd noting the Deaton article and asking “when we should schedule the interview.” Compl. ¶ 13 & Fig. 2A. Less than two hours later, before receiving any response, Plaintiff sent a second email to Mr. Floyd, Ms. Caputo, and others. *Id.* ¶ 14. In it, Plaintiff asserted that the timing of *The Belmont Voice*’s coverage “can only mean you have no intent in doing any interview,” suggested that the delay was racially motivated, and demanded that *The Belmont Voice* confirm “by 5:00 PM EST tomorrow” a specific date and time for an interview “that must take place within the next 5 business days.” *Id.* & Fig. 2B. If *The Belmont Voice* did not comply, Plaintiff warned, he would file an “emergency complaint for

Injunctive Relief," submit a complaint to the IRS, and release the email chain to regional news outlets and community networks. *Id.* ¶ 14

The next day, Saturday, September 26, Ms. Caputo responded: "Our editorial team is planning further coverage of this race and does plan to include your campaign in that coverage. They'll be in touch as their reporting progresses." *Id.* ¶ 15 & Fig. 3A.

On Monday, September 28, Plaintiff sent Ms. Caputo, Mr. Floyd, and others an email with the subject line "Racist 'Belmont Voice' Must Be Punished for Violating Multiple Federal Laws." *Id.* ¶ 16 & Fig. 3B. The email called Defendants "racist scumbags," declared that "[y]ou have broken the Law and you must be punished," threatened federal litigation and IRS proceedings to "revoke your non-profit tax-exempt status," warned that Plaintiff's "global movement of over 3 million followers" would be "made fully aware" of Defendants' supposed racism, and closed with an expletive directed at Defendants and *The Belmont Voice*. *Id.* Fig. 3B.

Notwithstanding these aggressive and concerning emails, Defendants followed through on their plan to cover third-party candidates. On October 14, 2026, Mr. Floyd emailed Plaintiff that *The Belmont Voice* was "working on a piece about independent candidates on the Nov. 3 ballot" and posed four questions about Plaintiff's motivation for running, his choice of race, his definition of a successful campaign, and voters' reactions to his campaign. Compl. ¶ 17 & Fig. 4. Mr. Floyd asked that the answers be "as concise and direct as possible," noted that *The Belmont Voice* "reserve[d] the right to edit for clarity and length," and requested responses by Friday, October 16. *Id.* One of the questions referred to Plaintiff selecting "the state senate as [his] target." *Id.*

In response, Plaintiff called the October 14 email "bad-faith pre-litigation pretext" and alleged that Mr. Floyd's use of "Mr. Ayyadurai" rather than "Dr. Ayyadurai" reflected "racial gatekeeping." *Id.* ¶¶ 17-18. On October 19, Plaintiff sent Defendants a "pre-litigation notice"

declaring that "a standard late Q&A or perfunctory write-up at this stage is legally insufficient," and demanding that Defendants agree by 5:00 p.m. that same day to (1) publish an "expansive, unedited feature profile" of Plaintiff; (2) publish a "top-of-page front-page notice" acknowledging his candidacy and "addressing the failure to provide concurrent non-partisan coverage"; (3) send a "dedicated email broadcast" featuring Plaintiff's "unedited platform" to *The Belmont Voice*'s full subscriber list; and (4) pin the profile and a campaign video to the top of *The Belmont Voice*'s homepage through Election Day. *Id.* ¶ 19 & Fig. 5. Plaintiff also stated that he had filed a complaint about Defendants with the Internal Revenue Service. *Id.* ¶ 20.

### D. This Lawsuit

On October 21, Plaintiff, proceeding *pro se*, filed a Verified Complaint asserting claims for breach of contract, promissory estoppel, violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I/H, and unfair and deceptive trade practices under M.G.L. c. 93A. Compl. ¶¶ 22-32. Plaintiff also moved for a temporary restraining order and preliminary injunction. *See generally,* Mot. The relief he seeks mirrors the demands in his October 19 email. *See* Compl. at 12 (prayer for relief); Mot. at 2. Plaintiff served the Complaint and Motion on Defendants by email on October 20, 2026. Compl. at 14 (certificate of service); Mot. at 3. Election Day is November 3, 2026. *See* Compl. ¶ 17, Fig. 4.

## ARGUMENT

Plaintiff Dr. Shiva Ayyadurai asks this Court to compel Defendants to publish and promote coverage about his candidacy for United States Senate on his schedule and in his way. *See* Compl. at 12. This relief is prohibited by the First Amendment. The Supreme Court has long held that "[l]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper," and that "the choice of material to go into a newspaper . . . constitute[s] the exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 258 & n.24. "Since all speech inherently

involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (internal citations and quotations omitted). An injunction compelling Defendants to make even just one of Plaintiff's requested publications would fly in the face of Defendants' First Amendment right to editorial discretion over *The Belmont Voice*'s content. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 386 (1973) (First Amendment protects editorial discretion of media outlets).

*Tornillo*, 418 U.S. at 258, is dispositive here. There, a candidate invoked a state "right of reply" statute to demand that the *Miami Herald* print his response to an editorial about his candidacy. 418 U.S. at 243-44. The Supreme Court unanimously struck down the statute, holding that a government-compelled "right of access" intrudes on "the function of editors" and that the First Amendment forbids compelling a newspaper to publish "that which reason tells them should not be published." *Id.* at 256, 258 (citation omitted). The Court reached that conclusion even though the statute was premised on precisely the fairness and "equal access" concerns Plaintiff invokes here. *Id*. at 247-54, 256. In keeping with the principles preserved by *Tornillo*, this court has rejected a similar effort to force a news organization to carry speech it had chosen not to publish. *See Affleck v. Harvard Crimson, Inc.*, 2025 WL 330577, at *3 (D. Mass. Jan. 29, 2025) (decisions about what content to publish "are well within the Crimson's traditional editorial functions"), *appeal filed,* (25-1223) (1st Cir. Mar. 5, 2025).

Plaintiff's requested relief is far more intrusive than the statute struck down in *Tornillo*: not just a right of reply, Plaintiff demands an "equal, unedited" feature profile, a front-page "correction" in words that would concede wrongdoing Defendants deny, a dedicated email to

Defendants' subscribers carrying his "full campaign platform," and control of the top of Defendants' homepage through Election Day. Compl. at 12; Mot. at 2. Each demand substitutes Plaintiff's judgment, enforced by this Court, for that of *The Belmont Voice* and its editorial team. And the demand that the profile be "unedited" would strip Defendants of even the most basic editorial function—the ability to "edit for clarity and length," which Defendants expressly reserved when they invited Plaintiff to participate in their coverage of independent candidates. Compl. ¶ 17.

But even if the First Amendment did not completely bar Plaintiff's relief, he is still entitled to none because he does not satisfy the requirements for a preliminary injunction. "A preliminary injunction is an extraordinary remedy" "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, In*c., 555 U.S. 7, 22, 24 (2008). A plaintiff seeking such relief must satisfy every one of the following elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20; *see also Esso Standard Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir.2006). Further, Plaintiff seeks a mandatory preliminary injunction "which requires affirmative action by the non-moving party." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 40–41 (1st Cir. 2010). Because it "alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Id*. at 41 (citing *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir.1981)). Plaintiff does not meet any of these requirements: His underlying claims are facially meritless; he has not shown any irreparable harm he will suffer absent the press coverage he demands; and both the balance of hardships and the public interest decisively favor Defendants. Plaintiff's motion should be denied in full.

## II. PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS[2]

Out of the Complaint's many inadequacies, perhaps the most glaring is the complete lack of merit to the underlying claims. Where "the movant 'cannot demonstrate that he is likely to succeed in his quest," like here, "the remaining factors become matters of idle curiosity.'" *Galvin*, 2026 WL 2409465, at *1 (citing *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)). None of Plaintiff's claims is likely to succeed, especially when balanced against Defendants' own free-speech rights, because he fails to even plausibly allege their elements.

### A. Plaintiff Has No Valid Breach of Contract Claim

Plaintiff's breach of contract claim requires him to show "(1) the existence of an agreement supported by consideration; (2) that [Plaintiff] performed its obligations under the agreement; (3) that the defendant breached the agreement; and (4) that [Plaintiff] suffered injury as a result." *Unum Grp. v. Benefit P'ship, Inc.*, 938 F. Supp. 2d 177, 185 (D. Mass. 2013) (citing *Singarella v. City of Bos.*, 342 Mass. 385, 387 (1961)). For several reasons, these allegations do not establish the elements of a breach of contract claim.

First, Plaintiff did not allege a valid contract. Plaintiff alleges that Defendants "issued a clear, written offer on August 26, 2026, promising candidate coverage upon the start of the general election." Compl. ¶ 22. But the referenced email exchange hardly amounts to a clear promise: It explained that "When we get to the general election, our coverage will expand to include other

---

[2] Although Plaintiff's Complaint does not assert his challenge to Defendant Belmont News Foundation, Inc.'s tax-exempt status under 26 U.S.C. 501(c)(3) as a claim for relief, such a claim would fail if Plaintiff were to amend the pleadings. In *Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991), the D.C. Circuit Court of Appeals held that plaintiff, a third-party political candidate, lacked standing to challenge the tax-exempt status of the Commission for Presidential Debates based on its alleged partisan activity, namely, excluding her from a presidential debate it hosted. The court found that her challenge lacked "sufficient redressability to warrant standing" because her injury could not be traced to the IRS's granting of tax-exempt status to the Commission. *Id.* at 1329-30. Plaintiff's challenge to Defendant's status would meet the same fate, for the same reason: Plaintiff's alleged injury does not arise from *The Belmont Voice*'s tax-exempt status, but from its decision on when and how to cover candidates, which would not be addressed by stripping Defendant of its tax-exempt status. Plaintiff thus lacks standing to challenge Belmont News Foundation, Inc.'s 501(c)(3) status.

candidates." Compl. Fig. 1. This was at most a statement of general intention. And "[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract." *Kuzmeskus* v. *Pickup Motor Co.*, 330 Mass. 490, 493 (1953). Defendants made no additional commitments, responding only that it should take "a week or a bit longer after the primary to get sorted." *See* Compl. Fig. 1. There was not then, and has never been, any discussion of a specific publication timeline, questions, point of view, or "equal coverage." *Id.*

Furthermore, even if these vague communications are sufficient to establish a firm offer, Plaintiff did not provide any consideration whatsoever to turn that offer into a legally binding contract. *Menzone v. Menzone*, 2003 Mass. App. Div. 161, 162 (2003) ("A hope of a benefit is not valid consideration"). Providing his campaign manager's contact information and threatening to sue are not consideration on Plaintiff's part sufficient to convert a statement of vague intention into a contract.

Second, Plaintiff claims he "accepted Defendants' offer and performed all necessary follow-up" and Defendants breached by "refusing to provide equal candidate coverage while granting feature publicity to an opposing major-party candidate." Compl. ¶¶ 23-24. This is contradicted by his own complaint. Despite Plaintiff's accusations of racism and expletive insults, *see id.* Fig. 3b ("F[***] you and the Belmont Voice"), Defendants did attempt to interview Plaintiff on October 14, 2026. *See id.* Fig. 4. He chose not to respond. Any damages he suffered as a result are not Defendants' responsibility. *See Bourgault v. Halben,* 2026 WL 1410725 (Mass. Ct. App. May 20, 2026) ("A plaintiff's recovery in contract is limited to injuries that are 'the natural and proximate consequences of the breach . . . . Damages not directly traceable to the violation of the contract or which result from other causes are not allowed") (quoting *Stratton v. Posse Normal Sch. of Gymnastics*, 265 Mass. 223, 225, 163 N.E. 905 (1928)).

### B. Plaintiff Has No Valid Promissory Estoppel Claim

Plaintiff's promissory estoppel claim is also legally insufficient. "Under Massachusetts law, the elements of promissory estoppel are '(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 357 (D. Mass. 2010) (citing *Bongaards v. Millen*, 440 Mass. 10, 15 (2003)). In addition, except for consideration, all other elements of a contract must be satisfied. *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995).[3] Plaintiff has not pled this claim.

First, there was no promise to provide coverage of Plaintiff on his timeline and terms. *See, supra*. At most, *The Belmont Voice* agreed to interview Plaintiff and followed through on this.

Second, Plaintiff pleads no detriment caused to him in reasonable reliance on Defendants' supposed promise. Plaintiff alleges that he "detrimentally relied on this promise by refraining from alternative local publicity measures under the expectation of fair coverage from their local newspaper." Compl. ¶ 27. But *The Belmont Voice* could not have anticipated that Plaintiff, a United States Senate candidate, would refrain from other available publicity measures because a local paper with a circulation of 11,000 homes and businesses planned to interview him at some point. If Plaintiff did actually rely in this manner, it would have been unreasonable. Nor can Plaintiff's struggling candidacy be blamed on *The Belmont Voice*. He is currently polling at 1% a month out from the general election. Floyd Decl. ¶ 6. One newspaper's editorial decisions were not going to

[3] Importantly, Plaintiff's promissory estoppel claim is foreclosed by his assertion that he and Defendants are parties to a valid contract. *See Malden Police Patrolman's Ass'n v. Malden*, 92 Mass. App. Ct. 53, 61 (2017) ("Where an enforceable contract exists ... a claim for promissory estoppel will not lie.").

turn the tide for his campaign and, certainly, will not lose him this race. In short, his allegations simply do not state a claim for promissory estoppel.

*Finally*, *Cohen v. Cowles* will not save this claim. *See* Dkt. 15 (Supplemental Memo) at 1-2. In that case, there was no question that a promise had been made, and that the plaintiff had acted in reliance on that promise. *Cohen v. Cowles Media Co*., 501 U.S. 663, 665 (1991) ("Cohen made clear to the reporters that he would provide the information only if he was given a promise of confidentiality. Reporters from both papers promised to keep Cohen's identity anonymous and Cohen turned over copies of two public court records..."). Here, there were no promises, no reasonable reliance, and no detriment.

### C. Plaintiff Has No Valid Civil Rights Claim Pursuant to the Massachusetts Civil Rights Act (M.G.L. c. 12, § 11H/I)

Under the MCRA, Plaintiff must prove "(1) his [or her] exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation, or coercion." *Cummings v. City of Newton,* 298 F. Supp. 3d 279, 289 (D. Mass. 2018); Mass. Gen. Laws Ann. ch. 12, § 11I.[4] Plaintiff alleges that he has "constitutionally protected rights to free speech, political candidacy, and equal participation in federal elections" that he believes Defendants violated. Compl. ¶ 29. Defendants have not obstructed or not interfered with Plaintiff's ability to speak freely, to be covered by other publications, to get his name on the ballot, or to canvass with voters. Indeed, Plaintiff has no constitutional right to be covered—let alone featured prominently—by *any*

[4] Under Mass. Gen. Laws Ann. ch. 12, § 11H, Plaintiff does not have standing. It states: "the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws Ann. ch. 12, § 11H(a)(1). Section 11H(b) concerns conduct of law enforcement officers, which clearly is inapplicable here.

publication. The only thing that Defendants have done here is exercise their own constitutional speech rights. That is not an appropriate basis for an MCRA claim. In *Redgrave v. Bos. Symphony Orchestra, Inc.*, for example, the court declined to impose liability under MCRA against an opera house that breached its contract with a performer after third-parties protested her involvement due to her political views. 855 F.2d 888, 904 (1st Cir. 1988). The court stated that "[w]e have no reason to think that the Massachusetts Legislature enacted the MCRA in an attempt to have its courts, at the insistence of private plaintiffs, oversee the editorial judgments of newspapers, the speech-related activities of private universities, or the aesthetic judgments of artists." *Id*. at 906. That is exactly what Plaintiff is attempting to do here. The same result as *Redgrave* is warranted.

Furthermore, Plaintiff has failed to allege that Defendants threatened, intimidated, or coerced him. A "'[t]hreat'...involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. ['Coercion' is] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" *Cummings,* 298 F. Supp. 3d at 289 (citing *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994)). So-called "constructive media exclusion and selective suppression of an Independent candidate's political speech during active voting" does not come close to meeting that bar. Compl. ¶ 30.

### D. Plaintiff Has No Valid Unfair and Deceptive Trade Practices Claim Pursuant to M.G.L. c. 93A

Liability under Section 93A requires conduct that "(1) falls within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers or other business

persons." *In re Daniel*, 568 B.R. 162, 175 (Bankr. D. Mass. 2017). Because Plaintiff has not established essential elements of this claim, he is unlikely so succeed on its merits.

*First*, Section 93A 9.3 requires specific notice of a deceptive trade practices claim under that statute 30 days before filing an action. Mass. Gen. Laws Ann. ch. 93A, § 9.3. Plaintiff did not make such a written demand that identified any deceptive trade practices. While Plaintiff first reached out to Defendants in late August 2026, he did not notify them of any violations of 93A. Compl. Fig.1. His repeated emails threatening litigation do not mention Section 93A until October 19, 2026—just two days before filing this complaint.

Second, *The Belmont Voice*'s refusal to publish the coverage Plaintiff wanted on his desired timeline is not actionable deceptive conduct. "[T]he publication and sale of newspapers is a private enterprise as distinguished from a business affected with public interest and ... those engaged in such a business are free to deal with whomever they choose." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 594 (1975). "[A] refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L. c. 93A, and is therefore not actionable." *Id.* at 599 (regarding newspaper's decision not to run certain ads); *see also White v. Bos. Phoenix, Inc.,* 1993 WL 818707, at *3 (Mass. Super. Nov. 23, 1993); *Chiodini v. Target Mktg. Grp., Inc.*, 58 Mass. App. Ct. 376, 378 (2003) ("It is generally recognized that in the absence of any purpose to create or maintain a monopoly, a newspaper, as a private enterprise, is free to deal with whomever it chooses.").

Third, Plaintiff identifies no "immoral, unethical, oppressive, or unscrupulous" conduct, as required for this claim. "Every deal that goes sour does not give rise to a G.L.c. 93A claim," *LJA Corp. v. Farace*, 1995 WL 808668, at *5 (Mass. Super. Mar. 14, 1995) (citing *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 600 (1979), citing *PMP Associates, Inc. v. Globe*

*Newspaper Co.,* 366 Mass. 593, 596 (1975)), and a "mere breach of contract is insufficient to establish Ch. 93A liability." *Gerli v. G.K. Hall & Co.*, 851 F.2d 452, 454 (1st Cir. 1988). Defendants' exercising their editorial discretion is not a deceptive practice; it is a constitutional right. And a general approach to editorial coverage which does not operate as an endorsement to a particular candidate—what happened here—is entirely consistent with *The Belmont Voice*'s obligations under. 26 U.S.C. 501(c)(3). Plaintiff has identified no wrongful conduct required to state a claim.

## III. PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

The burden of demonstrating irreparable harm rests "squarely upon the movant." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). And a movant cannot rely on harm that is "speculative" or "tenuous;" he must show a real and imminent injury. *Ross-Simons*, 102 F.3d at 19. Further, irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Braintree Lab'ys*, 622 F.3d at 42–43 (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir.2009)), such that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Id.* (citing *Mass. Coal. of Citizens with Disabilities,* 649 F.2d at 75). Thus, even if Plaintiff had demonstrated a likelihood of success on the merits, he would still have to make "at least some positive showing of irreparable harm." *Id.* (citing *Gately v. Commonwealth of Mass.,* 2 F.3d 1221, 1232 (1st Cir.1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief.")). And where, as here, Plaintiff has made no showing of a likelihood of success on the merits, he must make an extraordinary showing of irreparable

harm to justify injunctive relief. *See Galvin*, 2026 WL 2409465, at *1 (citing *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)). Plaintiff cannot make that showing for at least four reasons.

*First*, Plaintiff has no legally cognizable right to coverage in *The Belmont Voice*, so its decision not to cover him in the manner he prefers cannot inflict a legally cognizable injury, let alone an irreparable one. "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.' That principle still holds true." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 813 (2019) (citation omitted). *See also Tornillo*, 418 U.S. at 258.

*Second*, any harm Plaintiff claims is of his own making. *The Belmont Voice* told Plaintiff that it planned to include his campaign in its coverage, Compl. ¶ 15 & Fig. 3A, and on October 14 invited him to participate in "a piece about independent candidates on the Nov. 3 ballot," *id.* ¶ 17 & Fig. 4. Plaintiff did not answer Mr. Floyd's questions, thereby declining to participate in the coverage *The Belmont Voice* planned. *Id.* ¶ 19 & Fig. 5; Floyd Decl. ¶ 8. A party cannot manufacture irreparable harm by declining the very opportunity he claims to have been denied.

*Third*, Plaintiff's theory of irreparable harm is premised on the faulty assumption that he could win his Senate campaign if *The Belmont Voice* was forced to publish favorable coverage of him on his terms. *See* Mot. at 1-2. But Belmont's entire population is only 27,118 people, with 24% estimated to be under-18 as of 2025.[5] Even without subtracting ineligible, unregistered, and unlikely voters, or Belmont residents who do not read *The Belmont Voice*, the relief Plaintiff demands to improve his standing with Belmont voters, even if successful, could not plausibly

[5] https://www.census.gov/quickfacts/fact/table/belmonttownmiddlesexcountymassachusetts/HSG495224 (last visited Oct. 23, 2026).

change the result of the upcoming election, where turnout has already exceeded 500,000 voters.[6] Nor has Plaintiff offered any plausible theory that coverage in *The Belmont Voice* is likely to cause voters to vote for him, which forecloses any claim that he will be irreparably harmed without access to Defendants' platform.

Plaintiff's failure to demonstrate irreparable harm is fatal to his motion, and the Court must deny the requested injunctive relief.

## IV. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN FAVOR OF DEFENDANTS

Injunctive relief should be denied also because the harm to Defendants that would result from issuance of the requested injunction—a restraint on Defendants' ability to publish speech of their choosing—far outweighs the harm to Plaintiff.

*First*, as set out above, an injunction requiring *The Belmont Voice* to publish the content Plaintiff demands would violate Defendants' First Amendment Rights. *See Tornillo*, 418 U.S. at 258. *See also Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1214 (9th Cir. 2002) ("[n]ewsgathering is the quintessential private activity, jealously guarded from impermissible government influence").

Plaintiff's requested relief would also operate as a restraint on Defendants' speech: a court order requiring Plaintiff's materials to occupy the top of Defendants' homepage through Election Day necessarily displaces the news Defendants would otherwise choose to feature there. *See* Floyd Decl. ¶¶ 4-5, 10; *Tornillo*, 418 U.S. at 256-57 (compelled access penalizes publisher by taking "space that could be devoted to other material the newspaper may have preferred to print"); *id.* at

[6] https://www.wcvb.com/article/2026-massachusetts-voter-turnout-early-voting-update-oct-22/74217228 (last visited Oct. 23, 2026).

259 (White, J., concurring) ("the First Amendment erects a virtually insurmountable barrier" against government regulation of what newspapers publish). The requested relief thus comes with "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Because of these constitutional considerations, granting the relief Plaintiff demands, even on an interim basis, would inflict profound injury upon Defendants since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126-27 (2d Cir. 2006) ("[e]ach passing day may constitute a separate and cognizable infringement of the First Amendment" and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Plaintiff attempts to justify his patently unconstitutional demands by citing Defendants' status as a 501(c)(3) nonprofit. But this status does not diminish their First Amendment rights or license a court to compel their speech. Provided they do not participate or intervene in a political campaign on behalf of any particular campaign, 26 U.S.C. § 501(c)(3)—and *The Belmont Voice* did not here, as it published interviews with *both* major party candidates—nonprofit news organizations exercise the same editorial freedom as any other publisher. S*ee Affleck*, 2025 WL 330577, at *3 (finding that nonprofit student newspaper had a First Amendment right to editorial discretion). Nor would Plaintiff have a right of action against Defendants even if their conduct ran afoul of federal tax-exemption rules—which it did not—as those do not create a private right of action, much less one that authorizes a court to order a nonprofit publisher to print a candidate's campaign materials. Whatever Plaintiff believes about the requirements of 26 U.S.C. § 501(c)(3), he has already submitted those views to the Internal Revenue Service, Compl. ¶ 20, and they

provide no basis for a mandatory injunction here. Second, the requested relief would do serious and irreparable harm to *The Belmont Voice*. As a local, nonprofit paper that principally covers municipal politics—which necessarily involves covering dozens of elections per year—the kind of comprehensive coverage of state-wide elections Plaintiff demands would stretch *The Belmont Voice*'s limited resources thin. Floyd Decl. ¶ 10. It would also threaten the paper's reputation for independence and fairness. Floyd Decl. ¶ 11. Allowing a third party to dictate the form and content of Defendants' journalism would be antithetical to its mission and erode the trust the paper has built with its audience since its founding. *Id.* The erosion of Defendants' constitutionally protected editorial discretion and the high potential for diminished audience trust are substantial harms to Defendants that tilt the balance of hardships decisively in Defendants' favor.

## V. THE PUBLIC INTEREST STRONGLY FAVORS DEFENDANTS

The public interest also weighs heavily against an injunction in this case. The Supreme Court has properly cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Here, in addition to protecting Defendants' First Amendment rights, the denial of Plaintiff's injunction would preserve the public's interest in receiving news from independent that can exercise their editorial judgment free from improper interference. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information."). This would further the goals of the First Amendment, by securing "the paramount public interest in a free flow of information to the people concerning public officials, their servants." *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964). *See also Yes for Life Political Action Comm. v. Webster*, 74 F. Supp. 2d 37, 43 (D. Me. 1999) (The public interest is served by protecting First Amendment rights from likely unconstitutional

infringement). However Plaintiff styles his demand for relief, it is nothing more than an attempt to coerce and compel a third party's speech, in violation of constitutionally enshrined public policy. His request should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff any form of injunctive relief in this action.

Dated: October 23, 2026

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

By: */s/ Rachel F. Strom* .
Rachel F. Strom
1251 Avenue of the Americas,
42nd Floor
New York, NY 10020
Telephone: (212) 603-6455
Fax: (212) 489-8340
RachelStrom@dwt.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the within document was filed through the CM/ECF system and served via email and via Overnight Mail to Plaintiff Dr. Shiva Ayyadurai at the below address:

Dr. Shiva Ayyadurai,
Plaintiff *Pro Se*
701 Concord Avenue
Cambridge, MA 02138
vashiva@cytosolve.com

Dated: October 23, 2026

/s/ *Rachel F. Strom*
Rachel F. Strom