**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE
2026 OCT 26 P 2: 16
U.S. DISTRICT COURT
DISTRICT OF MASS.

DR. SHIVA AYYADURAI,

Candidate for United States Senate,

*Plaintiff,*

*v.*

BELMONT NEWS FOUNDATION, INC, (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO,

*Defendants.*

Civil Action No. 1:26-cv-14760-ADB

FIRST AMENDED VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS (42 U.S.C. §§ 1981, 1985(3), 1983; 28 U.S.C. § 1331), BREACH OF CONTRACT, PROMISSORY ESTOPPEL, AND UNFAIR TRADE PRACTICES (M.G.L. c. 93A)

JURY TRIAL DEMANDED

**FIRST AMENDED VERIFIED COMPLAINT**

**INTRODUCTION**

1. Plaintiff Dr. Shiva Ayyadurai ("Dr. SHIVA"), proceeding pro se, brings this First Amended Verified Complaint pursuant to this Court's Order granting leave to amend, to remedy an intentional, bad-faith scheme of discriminatory breach of contract, private civil rights conspiracy, and candidate gatekeeping executed by Defendants during an active election for the United States Senate.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br>Candidate for United States Senate,<br>*Plaintiff,*<br>*v.*<br>BELMONT NEWS FOUNDATION, INC, (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO,<br>*Defendants.* | Civil Action No. 1:26-cv-14760-ADB<br>FIRST AMENDED VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS (42 U.S.C. §§ 1981, 1985(3), 1983; 28 U.S.C. § 1331), BREACH OF CONTRACT, PROMISSORY ESTOPPEL, AND UNFAIR TRADE PRACTICES (M.G.L. c. 93A)<br>JURY TRIAL DEMANDED |

**FIRST AMENDED VERIFIED COMPLAINT**

## INTRODUCTION

1. Plaintiff Dr. Shiva Ayyadurai ("Dr. SHIVA"), proceeding pro se, brings this First Amended Verified Complaint pursuant to this Court's Order granting leave to amend, to remedy an intentional, bad-faith scheme of discriminatory breach of contract, private civil rights conspiracy, and candidate gatekeeping executed by Defendants during an active election for the United States Senate.

2. Far from being an understaffed, struggling "local community newspaper," Defendant Belmont News Foundation, Inc. is a cash-rich, heavily capitalized entity sitting on **$578,967 in net assets and liquid cash reserves**, subsidized by national non-profit pass-through conduits. They sit on this war chest while the average Independent voter they claim to inform—who now represents 65% of the Massachusetts electorate—has less than $1,000 in savings, and while the median net worth of a Black resident in the Greater Boston area famously hovers at $8.

Moreover, Defendants do not function as an authentic hyper-local newsroom; they operate as an active node within a coordinated regional media syndicate deployed to protect and promote the two-party duopoly. While publicly posturing as a non-partisan 501(c)(3) public charity, Defendants entered into a binding candidate coverage contract with Plaintiff, induced Plaintiff to forfeit physical field campaigning in his hometown during active early voting, concealed their pooled consortium operations profiling an establishment opponent, and dangled Plaintiff for seven weeks before executing a bad-faith breach - attempting to excuse their candidate exclusion through discriminatory tone-policing rooted in racial and caste-based stereotypes. This Court possesses undeniable federal subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1981 and 1985(3).

## PARTIES

3. Plaintiff Dr. Shiva Ayyadurai is an individual residing at 69 Snake Hill Road, Belmont, Massachusetts 02478. Plaintiff is an MIT-trained biological engineer (four degrees from MIT, including a Ph.D. in biological engineering), a 45-year resident and taxpayer of Belmont, and an officially certified, ballot-qualified Independent candidate for the United States Senate

representing the 65% unenrolled voter majority of Massachusetts. Plaintiff is a naturalized American citizen of Indian ancestry, brown-skinned, and born into the oppressed lower castes, “Shudras.”

4. Defendant Belmont News Foundation, Inc. is a Massachusetts non-profit corporation with a principal place of business in Belmont, Massachusetts, doing business as “The Belmont Voice”(EIN: 92-3493154). Defendant is an IRS-chartered 501(c)(3) tax-exempt public charity.

5. Defendant Jesse A. Floyd is an individual residing in Massachusetts and is the Editor-in-Chief of The Belmont Voice. Defendant Floyd is a veteran journalist of over 35 years who executed the binding written contract at issue and actively directed the discriminatory candidate exclusion.

6. Defendant Sarah Caputo is an individual residing in Belmont, Massachusetts, and serves as Board Chair and an executive officer of Belmont News Foundation, Inc., who ratified the agreement and orchestrated the pretextual delay of Plaintiff’s campaign.

**JURISDICTION AND VENUE**

7. This Court possesses original federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(1), (3), and (4) because this action arises under the laws and Constitution of the United States, specifically:

a. 42 U.S.C. § 1981 (protection of the equal right to make and enforce contracts against non-governmental discrimination and impairment);

b. 42 U.S.C. § 1985(3) (private conspiracy to impede, hinder, and obstruct the due course of justice and interfere with federal candidate advocacy in a federal election);

c. 42 U.S.C. § 1983 (deprivation of First and Fourteenth Amendment rights under color of law via pervasive public entwinement in federal election administration); and,

d. Embedded federal questions under the doctrine of Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308 (2005), requiring construction of federal statutes governing 501(c)(3) public charities (26 U.S.C. § 501(c)(3)) and federal candidate non-partisanship mandates (IRS Rev. Rul. 86-95).

8. This Court has supplemental jurisdiction over Plaintiff's state-law claims for breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and M.G.L. c. 93A pursuant to 28 U.S.C. § 1367, as they form part of the exact same Article III case or controversy.

9. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b)(1) and (2) because all parties reside in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

**STATEMENT OF FACTS**

**A. The Parties and Statutory Backdrop**

10. Defendant Belmont News Foundation, Inc. is an IRS 501(c)(3) tax-exempt public charity. Under federal tax law (26 U.S.C. § 501(c)(3)) and binding Treasury regulations (IRS Revenue Rulings 86-95, 80-282, and 2007-41), a 501(c)(3) entity is strictly prohibited from participating in, or intervening in, any political campaign on behalf of or in opposition to any candidate. When a 501(c)(3) publication chooses to provide candidate coverage, federal law mandates that it provide strict non-partisan parity and equal presentation to all certified candidates.

11. According to official IRS Form 990 filings for Defendant Belmont News Foundation, Inc. (Exhibit D), the organization reported $658,712 in total revenue, generated a net operating surplus of $213,825, and concluded the year sitting on **$578,967 in net assets and cash reserves on hand**. The organization is heavily capitalized through national non-profit pass-through pipelines including NewsMatch, the Miami Foundation, and the Institute for Nonprofit News (INN). Defendants' attempt to plead newsroom poverty or a lack of resources to excuse their contract breach is demonstrably false.

**B. The August 26, 2026 Binding Contract**

12. On August 26, 2026, at 8:58 AM, Defendant Jesse A. Floyd transmitted an email to Plaintiff explicitly offering general election candidate coverage: "Tuesday is a primary election, and our coverage was focused on candidates facing primary challenges. When we get to the general election, our coverage will expand to include other candidates. Thank you for reaching out."

13. On August 26, 2026, at 11:38 AM, Plaintiff accepted Defendant's offer and tendered consideration by directing his campaign manager and communications director to arrange scheduling: "Sounds good. Reach out to Mike Mosca - our campaign manager or Crystal Ellis - our dir of communications to setup interview. Dr. Shiva."

14. On August 26, 2026, at 11:39 AM, Defendant Floyd confirmed the executed contract and set the operational timeline: "Thanks much. It will be a week or a bit longer after the primary for us to get sorted." (Exhibit A).

15. The Massachusetts primary took place on Tuesday, September 1, 2026. Under the unambiguous terms of Defendant Floyd's written confirmation, candidate coverage was scheduled to commence between September 10 and September 15, 2026.

**C. Invariable Routine Practice and Detrimental Operational Reliance (Fed. R. Evid. 406)**

16. Plaintiff represents the 65% independent, unenrolled majority in Massachusetts and operates entirely without corporate PAC funding, relying on targeted, grassroots volunteer literature distribution.

17. Under Federal Rule of Evidence 406, Plaintiff maintains an established, invariable routine practice: at daily 7:00 PM operational briefings, when dedicated earned media coverage is confirmed in a given municipality, the campaign systematically halts physical street leafleting in that area to reallocate scarce volunteer labor to other regions (as documented with WWLP in Springfield and local radio in Fitchburg).

18. In direct, reasonable reliance on Defendants' August 26 written contract, Campaign Manager Nicholas Lupo and Field Director Barbara Herda halted active street leafleting outside the local Belmont grocery store and pulled volunteer field organizers entirely out of Belmont. Plaintiff surrendered his physical ground game in his hometown of 45 years in direct reliance on Defendants' written agreement. (Exhibits B and C).

**D. The Village Works Consortium and Pretextual Concealment**

19. Following the September 1 Primary, Defendants breached their mid-September deadline and went silent.

20. On September 24, 2026, Defendant Floyd traveled to The Village Works in Brookline, Massachusetts, to participate in a pooled regional reporting cartel comprising six non-profit newsrooms (including The Belmont Voice, The Waltham Times, Brookline.News, Cambridge Day, The Lexington Observer, and Your Arlington).

21. In a rented studio with pooled audio gear, cameras rolling, and staff assembled, Defendant Floyd participated in an exclusive, hour-long interview with Republican candidate John Deaton, coordinating across six publications to manufacture Mr. Deaton as an "independent voice."

22. Defendant Floyd had the pooled staff, the cameras, the rented facility, and the budget. Defendant Floyd knowingly chose to exclude Plaintiff - a certified candidate who has resided in Belmont for 45 years - from that pooled interview, in direct violation of the August 26 agreement.

23. On September 25, 2026, Plaintiff requested an interview date after discovering Defendants had published their profile of Mr. Deaton.

24. On September 26, 2026, Board Chair Sarah Caputo intervened in writing on behalf of Belmont News Foundation, Inc., officially ratifying that coverage would occur ("Our editorial team is planning further coverage of this race and does plan to include your campaign…"). However, Defendant Caputo deliberately concealed that Defendant Floyd had participated in the Deaton syndicate interview literally 48 hours earlier, utilizing vague language to dangle Plaintiff's campaign while mail-in voting was underway. Under *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451 (1991), intentional concealment to stall performance constitutes bad-faith pretext.

**E. The Seven-Week Delay and Reckless October 14 Questionnaire**

25. For seven full weeks (49 days), Defendants stalled Plaintiff while mail-in ballots were printed, mailed, and cast by Belmont voters.

26. On October 14, 2026, Defendant Floyd transmitted four candidate questions to Plaintiff. Defendant Floyd, a 35-year veteran journalist who understands that every word matters in journalism, treated Plaintiff's certified federal candidacy with reckless disregard by addressing Plaintiff's United States Senate race as a "state senate" race ("Why did you select the state senate as your target?"). Furthermore, Defendants refused to address Plaintiff by his earned academic title ("Dr."), addressing him dismissively as "Mr." while affording full institutional deference to white, major-party candidates.

27. At that juncture, having experienced two months of bad-faith concealment and discriminatory disrespect, Plaintiff could no longer rely on unmonitored verbal assurances without an enforceable court order.

**F. Discriminatory Animus, Tone-Policing, and Duopoly Gatekeeping**

28. In their 26-page opposition brief (Docket 18), Defendants do not deny their written emails. Instead, they obsess over Plaintiff's tone, deploying the words "aggression" and "aggressive" three separate times, elevating it to a formal section heading, and branding Plaintiff's protected political speech as "concerning."

29. Defendants' tone-policing constitutes intentional discriminatory animus under established sociological and civil rights standards. Plaintiff is an immigrant born into the oppressed Shudra

caste of India who grew up working-class in New Jersey and has lived in Belmont for 45 years. Defendants - an elite media organization whose executive management and editorial control are held by white legacy figures - expected Plaintiff to conform to the paternalistic "model minority" trope: a quiet, deferential immigrant who smiles politely and accepts institutional exclusion. As recognized across extensive legal and sociological literature, "tone policing" and the weaponization of false charges of "aggression" against fighters of the oppressed are well-documented mechanisms of institutional subordination designed to silence victims, shift attention away from harm, and deflect from systemic wrongdoing. See, e.g.:

- Audre Lorde, The Uses of Anger: Women Responding to Racism, 9 Women's Stud. Q. 7 (1981) (documenting the institutional practice wherein dominant hierarchies deflect from substantive injustice by fixating on and condemning the righteous tone or delivery of the aggrieved);
- Frank H. Wu, Yellow: Race in America Beyond Black and White (Basic Books 2002) (analyzing how Asian and immigrant minorities are subjected to conditional acceptance conditioned upon docile subservience, and how an outsider's assertive defense of legal rights is pathologized by establishment institutions as disruptive, alien “aggression”);
- Derald Wing Sue et al., Racial Microaggressions in Everyday Life, 62 Am. Psychologist 271 (2007) (analyzing the institutional tactic of branding marginalized individuals who demand equal treatment as “confrontational” or “aggressive” to invalidate their legitimate grievances);
- Keith J. Bybee, How Civility Works (Stanford Univ. Press 2016) (demonstrating how demands for performative “civility” operate as instruments of elite exclusion to protect established hierarchies from outsider challenges); and,

- Nicole Cardoza, How Tone Policing is Used to Silence Marginalized People, Mass. Legal Services / Anti-Racism Daily (2023) (analyzing tone policing as an exclusionary tactic rooted in racialized expectations of deference, weaponized by dominant institutions to put the aggrieved "back in their place," prioritize elite comfort over accountability, and silence individuals challenging systemic bias).

While Defendants and their leadership curate an outward image of racial enlightenment - perfunctorily displaying "Black Lives Matter" signs and progressive branding as performative virtue-signaling to market themselves as non-racist - their actual conduct exemplifies this exact dynamic. When white corporate counsel zealously demands contract enforcement, Defendants respect it as legitimate legal advocacy; when an outsider of Indian ancestry and oppressed-caste origins demands the exact same compliance, Defendants label it "aggression" and "concerning." Defendants deployed this weaponized civility as an ex post facto pretext to breach their binding contract, enforce an editorial blackout during active voting, and punish a brown-skinned candidate who refused institutional subservience.

30. Defendants' conduct is further fueled by deep-seated localized political animus. Defendant Belmont News Foundation, Inc. was incubated and founded by leadership from the Belmont Citizens Forum, whose longtime President, J. Grant Monahon - another white establishment figure - is a primary financial backer of the paper and Plaintiff's direct abutter on Snake Hill Road. Mr. Monahon has engaged in a continuous, multi-year feud to suppress Plaintiff's political expression, dating back to Plaintiff's independent candidacy against Elizabeth Warren for the United States Senate. Specifically, after decades of erecting political signs on common neighborhood land for his favored Democratic establishment candidates, Mr. Monahon

mobilized residents to prohibit campaign signs on common land exclusively to target and silence Plaintiff. The Belmont News Foundation operates as an institutional extension of this localized animus, utilizing non-profit tax-exempt assets to execute an editorial blackout and candidate gatekeeping against the very neighbor its founder has spent years attempting to silence.

31. In the scientific UMass Amherst poll, Plaintiff commands over 15% of the independent electorate. Separately, Dr.SHIVA has a nearly 80% statewide brand recognition. Defendants conspired with regional non-profit consortia to suppress Plaintiff's authentic independent candidacy and bolster the establishment duopoly.

## CAUSES OF ACTION

### COUNT I
### Violation of 42 U.S.C. § 1981 (Denial of Equal Rights to Make and Enforce Contracts Free from Ancestral, Racial, and Ethnic Discrimination)
### (Against All Defendants)

32. Plaintiff realleges and incorporates all preceding paragraphs.

33. 42 U.S.C. § 1981 guarantees to all persons within the jurisdiction of the United States the same right to make and enforce contracts including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship as is enjoyed by white citizens.

34. Under 42 U.S.C. § 1981(c), the rights protected by Section 1981 apply to nongovernmental and private contractual discrimination and impairment. Section 1981 requires no state action.

35. Under Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987), Section 1981 protects against discrimination based on ancestry, ethnic characteristics, and caste heritage.

36. Plaintiff entered into a binding contractual agreement with Defendants on August 26, 2026. Defendants intentionally breached the agreement, subjected Plaintiff to bad-faith delays, dangled his campaign for 49 days, and tone-policed Plaintiff's contract enforcement as “aggressive” and “concerning” because Plaintiff is an immigrant of low-caste (Shudra) Indian ancestry who refused to submit to paternalistic institutional deference.

37. Defendants extended full contract compliance, collaborative pooling, and favorable coverage to white, establishment candidates while subjecting Plaintiff to pretextual exclusion.

38. But for Plaintiff's ancestry and refusal to conform to deferential ethnic stereotypes, Defendants would have performed their contractual obligations. Defendants violated 42 U.S.C. § 1981, causing Plaintiff irreparable electoral and reputational harm.

**COUNT II**
**Violation of 42 U.S.C. § 1985(3) (Conspiracy to Interfere with Federal Electoral Advocacy and Deprive Equal Protection)**
**(Against All Defendants)**

39. Plaintiff realleges and incorporates all preceding paragraphs.

40. 42 U.S.C. § 1985(3) prohibits two or more persons from conspiring to prevent by force, intimidation, or threat any citizen lawfully entitled to vote from giving support or advocacy in a legal manner toward or in favor of the election of any legally qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy.

41. Defendants formed an active, coordinated syndicate with at least five other regional non-profit news organizations at The Village Works in Brookline to promote Republican candidate John Deaton while executing a coordinated blackout against Plaintiff's certified United States Senate candidacy.

42. Defendants acted in concert to deploy tax-exempt civic media assets to suppress Plaintiff's federal electoral advocacy, utilizing deceptive communications to run out the voting clock during active mail-in voting, depriving Plaintiff of equal protection and equal candidate access under the laws.

**COUNT III**
**Violation of 42 U.S.C. § 1983 (First and Fourteenth Amendments via Public Entwinement)**
**(Against All Defendants)**

43. Plaintiff realleges and incorporates all preceding paragraphs.

44. Under Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288 (2001), a nominally private entity acts under color of state law when there is pervasive entwinement of public institutions and public policy in its operations and management.

45. Defendant Belmont News Foundation, Inc. operates as a tax-subsidized civic entity entwined with municipal access, state foundation pipelines, and public election administration in Belmont.

46. By exercising quasi-governmental gatekeeping over candidate presentation for a certified federal election and denying Plaintiff equal access based on partisan preference, Defendants acted under color of state law to deprive Plaintiff of his First Amendment rights and Fourteenth Amendment equal protection.

**COUNT IV**
**Substantial Embedded Federal Question Under 28 U.S.C. § 1331 (Grable Doctrine)**
**(Construction of 26 U.S.C. § 501(c)(3) and IRS Revenue Ruling 86-95)**
**(Against All Defendants)**

47. Plaintiff realleges and incorporates all preceding paragraphs.

48. Under Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308 (2005), federal question jurisdiction exists over state-law claims that necessarily raise a stated, substantial, and contested federal issue.

49. Under Massachusetts contract law, contracts must be construed to serve a lawful purpose. Shea v. Bay State Gas Co., 383 Mass. 218, 222 (1981). Defendant Belmont News Foundation, Inc. is an IRS 501(c)(3) charity.

50. The scope and enforceability of the August 26 contract necessarily turn on a substantial question of federal law: whether the term "coverage" incorporated federal 501(c)(3) candidate neutrality mandates under 26 U.S.C. § 501(c)(3) and IRS Revenue Ruling 86-95, prohibiting the publication of candidate profiles without equal presentation to all qualified candidates.

**COUNT V**
**Breach of Contract (Common Law)**
**(Against All Defendants)**

51. Plaintiff realleges and incorporates all preceding paragraphs.

52. On August 26, 2026, Defendants made a clear written offer of general election candidate coverage. Plaintiff accepted and tendered valid consideration. Defendants confirmed the agreement and operational schedule.

53. Defendants materially breached the contract by failing and refusing to provide candidate coverage, excluding Plaintiff from candidate interviews, and attempting to run out the election clock.

54. Under Cohen v. Cowles Media Co., 501 U.S. 663 (1991), the First Amendment does not grant news publishers immunity from breach of contract.

**COUNT VI**
**Promissory Estoppel (Common Law)**
**(Against All Defendants)**

55. Plaintiff realleges and incorporates all preceding paragraphs.

56. Defendants made an unambiguous written promise on August 26, 2026, to provide general election coverage to Plaintiff, and ratified that promise on September 26, 2026.

57. Defendants reasonably expected Plaintiff to rely on this promise.

58. Plaintiff reasonably and foreseeably relied on this promise to his severe detriment by withdrawing physical field leafleting teams from Belmont during active early voting under an established routine practice (Fed. R. Evid. 406).

59. Injustice can only be avoided through specific performance and equitable enforcement of Defendants' promise.

**COUNT VII**
**Breach of the Implied Covenant of Good Faith and Fair Dealing (Common Law)**
**(Against All Defendants)**

60. Plaintiff realleges and incorporates all preceding paragraphs.

61. Every contract in Massachusetts contains an implied covenant of good faith and fair dealing. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451 (1991).

62. Defendants breached this covenant by actively concealing their September 24 syndicate interview with John Deaton, utilizing Defendant Caputo's September 26 email to deceptively stall Plaintiff, and sending a derogatory questionnaire on October 14 misidentifying Plaintiff's federal candidacy as a "state senate" race.

**COUNT VIII**
**Unfair and Deceptive Trade Practices (M.G.L. c. 93A)**
**(Against All Defendants)**

63. Plaintiff realleges and incorporates all preceding paragraphs.

64. Defendants engage in trade or commerce within Massachusetts as a digital news publisher.

65. Holding out as a non-partisan 501(c)(3) community news outlet, taking tax-exempt funds, and entering into candidate coverage agreements while actively coordinating a partisan media blackout of an independent candidate constitutes an unfair and deceptive business practice under M.G.L. c. 93A, §§ 2 and 11.

66. Defendants' violations were willful, knowing, and conducted in bad faith, entitling Plaintiff to treble damages and statutory remedies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter an immediate Preliminary Injunction or formal Consent Order under Fed. R. Civ. P. 65 compelling Defendants to:

1. Immediately publish Plaintiff's written answers to the four questions drafted by Defendant Floyd on October 14, 2026, corrected to state that Plaintiff is running for the United States Senate;

2. Publish said candidate Q&A with the same digital prominence, formatting, and layout template provided to opposing candidates;

3. Publish a neutral factual notice on the homepage of The Belmont Voice acknowledging Plaintiff's officially certified U.S. Senate candidacy; and

4. Immediately preserve all internal notes, correspondence, emails, and consortium communications concerning candidate coverage decisions for the 2026 election;

B. Award Plaintiff actual compensatory damages, statutory treble damages under M.G.L. c. 93A, and costs;

C. Issue a Declaratory Judgment declaring Defendants' actions in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and Massachusetts contract law; and

D. Grant such other and further relief as this Court deems just and proper.

## VERIFICATION

I, Dr. Shiva Ayyadurai, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in this action, that I have read the foregoing First Amended Verified Complaint, and that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Executed this 26th day of October, 2026.

/s/ Dr. Shiva Ayyadurai

Dr. Shiva Ayyadurai, Plaintiff Pro Se

701 Concord Avenue

Cambridge, MA 02138

Phone: 857-393-7910

Email: vashiva@cytosolve.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2026, a true and correct copy of the foregoing First Amended Verified Complaint and attached exhibits was served via electronic mail upon counsel of record for Defendants:

Rachel Strom, Esq.

Davis Wright Tremaine LLP

Counsel for Defendants

Email: rachelstrom@dwt.com

Dr. Shiva Ayyadurai,

*Plaintiff* Pro Se

701 Concord Avenue

Cambridge, MA 02138

E: vashiva@cytosolve.com