**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br><br>Plaintiff,<br><br>v.<br><br>BELMONT NEWS FOUNDATION, INC. (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO,<br><br>Defendants. | Case No. 1:26-cv-14760-DLC |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO COMPEL PUBLICATION**

DAVIS WRIGHT TREMAINE LLP
Rachel F. Strom
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Telephone: (212) 603-6455
Fax: (212) 489-8340
RachelStrom@dwt.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................... 1

STATEMENT OF FACTS ..................... 2

A. The Parties ..................... 2

B. *The Belmont Voice*'s Election Coverage ..................... 3

C. Plaintiff Demands Coverage From *The Belmont Voice* ..................... 3

D. This Lawsuit ..................... 6

ARGUMENT ..................... 6

I. Plaintiff Has No Likelihood of Success on the Merits ..................... 8

A. Plaintiff Has No Valid Contract Claims (Counts V and VII) ..................... 8

B. Plaintiff Has No Valid Promissory Estoppel Claim (Count VI) ..................... 9

C. Plaintiff Has No Valid Unfair and Deceptive Trade Practices Claim Pursuant to M.G.L. c. 93A (Count VIII) ..................... 11

D. Plaintiff Has No Valid Claim Under 42 U.S.C. §§ 1981 (Count I) ..................... 12

E. Plaintiff Has No Valid Claim Under 42 U.S.C. § 1985(3) (Count II) ..................... 14

F. Plaintiff Has No Valid Claim Under 42 U.S.C. § 1983 (Count III) ..................... 15

G. Plaintiff Has No Valid Claim Under 28 U.S.C. § 1331 (Counts IV) ..................... 16

II. Plaintiff Cannot Demonstrate Irreparable Harm ..................... 18

III. The Balance of Hardships Weighs Heavily in Favor of Defendants ..................... 19

IV. The Public Interest Strongly Favors Defendants ..................... 20

CONCLUSION ..................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affleck v. Harvard Crimson, Inc.*,
2025 WL 330577 (D. Mass. Jan. 29, 2025),
*appeal filed* (25-1223) (1st Cir. Mar. 5, 2025) ....7, 17

*Ayyadurai v. Galvin*,
2026 WL 2409465 (D. Mass. Aug. 18, 2026) ....8

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....19

*Bourgault v. Halben*,
2026 WL 1410725 (Mass. Ct. App. May 20, 2026) ....9

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010) ....17

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993)....14

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*,
531 U.S. 288 (2001)....15

*Brunette v. Humane Soc'y of Ventura Cnty.*,
294 F.3d 1205 (9th Cir. 2002) ....15

*Chiodini v. Target Mktg. Grp., Inc.*,
58 Mass. App. Ct. 376 (2003)....11

*City of Chelsea v. Trump*,
802 F. Supp. 3d 289 (D. Mass. 2025) ....18

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)....10

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
589 U.S. 327 (2020)....12

*Conward v. Cambridge Sch. Comm.*,
171 F.3d 12 (1st Cir. 1999)....13

*Cruz-Arce v. Mgmt. Admin. Servs. Corp.*,
19 F.4th 538 (1st Cir. 2021)....15

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ..... 12

*Elrod v. Burns*,
427 U.S. 347 (1976) ..... 19

*Esso Standard Oil Co. v. Monroig–Zayas*,
445 F.3d 13 (1st Cir.2006) ..... 7

*Fulani v. Brady*,
935 F.2d 1324 (D.C. Cir. 1991) ..... 16

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ..... 20

*Gerli v. G.K. Hall & Co.*,
851 F.2d 452 (1st Cir. 1988) ..... 12

*Gonzalez-Maldonado v. MMM Healthcare, Inc.*,
693 F.3d 244 (1st Cir. 2012) ..... 16

*Hammond v. Kmart Corp.*,
733 F.3d 360 (1st Cir. 2013) ..... 12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ..... 6

*In re Daniel*,
568 B.R. 162 (Bankr. D. Mass. 2017) ..... 11

*Kuzmeskus* v. *Pickup Motor Co.*,
330 Mass. 490 (1953) ..... 8

*LJA Corp. v. Farace*,
1995 WL 808668 (Mass. Super. Mar. 14, 1995) ..... 12

*Maceira v. Pagan*,
649 F.2d 8 (1st Cir. 1981) ..... 19

*Maher v. Sun Publications, Inc.*,
459 F. Supp. 353 (D. Kan. 1978) ..... 17

*Malden Police Patrolman's Ass'n v. Malden*,
92 Mass. App. Ct. 53 (2017) ..... 10

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ..... 16, 18

*Menzone v. Menzone*,
2003 Mass. App. Div. 161 (2003)....9

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)....1, 7, 18, 19

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)....19

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986)....20

*Parker v. Landry*,
935 F.3d 9 (1st Cir. 2019)....14, 15

*Perez-Sanchez v. Pub. Bldg. Auth.*,
531 F.3d 104 (1st Cir. 2008)....14

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
366 Mass. 593 (1975)....11

*R.I. Hosp. Tr. Nat'l Bank v. Varadian*,
419 Mass. 841 (1995)....10

*Reyes v. Municipality of Guaynabo*,
59 F. Supp. 2d 305 (D.P.R. 1999)....14

*Rivera v. Costco Wholesale Corp.*,
2026 WL 1180480 (D.P.R. Jan. 29, 2026)....13

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)....17, 18

*Schiff v. IRS*,
2026 WL 699650 (D.P.R. Mar. 12, 2026)....15

*Sheinkopf v. Stone*,
927 F.2d 1259 (1st Cir. 1991)....4

*Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025), *pet. for cert. filed* (U.S. June 22, 2026)....14

*TechTarget, Inc. v. Spark Design, LLC*,
746 F. Supp. 2d 353 (D. Mass. 2010)....10

*Unum Grp. v. Benefit P'ship, Inc.*,
938 F. Supp. 2d 177 (D. Mass. 2013)....8

*Weekes v. Cohen Cleary P.C.*,
723 F. Supp. 3d 97 (D. Mass. 2024) ........................................................................9

*White v. Bos. Phoenix, Inc.*,
1993 WL 818707 (Mass. Super. Nov. 23, 1993) ........................................................11

*Winter v. Nat. Res. Def. Council, Inc*.,
555 U.S. 7 (2008)..........................................................................................7, 20

*Yes for Life Political Action Comm. v. Webster*,
74 F. Supp. 2d 37 (D. Me. 1999) ............................................................................20

**Statutes**

26 U.S.C. § 501(c)(3).................................................................................................17

26 U.S.C. § 1331....................................................................................................6, 16

42 U.S.C. § 1983.........................................................................................................6

42 U.S.C. §§ 1981 *et seq*.........................................................................................6, 12

42 U.S.C. § 1985(3) ...............................................................................6, 13, 14, 15

47 U.S.C. § 315(a)(2)...................................................................................................1

M.G.L. c. 12, § 11I/H....................................................................................................6

Mass. Gen. Laws Ann. Chapter
93A *et seq* ...........................................................................................................6, 11

**Other Authorities**

IRS Revenue Ruling 86-95 (1986) ..........................................................................17

Defendants Belmont News Foundation, Inc., publisher of *The Belmont Voice* (or "*The Voice*"), Jesse A. Floyd, and Sarah Caputo (together, "Defendants"), by and through their undersigned attorneys, submit this memorandum of law in opposition to the renewed motion of Plaintiff Dr. Shiva Ayyadurai ("Plaintiff") seeking a temporary restraining order and preliminary injunction (Dkts. 22-23) to force Defendants to publish and feature articles concerning his Senate campaign.

## PRELIMINARY STATEMENT

Plaintiff's attempt to remedy this action by asserting federal claims does not change that it is fundamentally meritless and unconstitutional: The First Amendment flatly prohibits Plaintiff's attempt to dictate the editorial decisions of an independent news outlet. Indeed, the Supreme Court has confirmed this, explicitly rejecting a "right of reply" law designed to provide "equal space" to candidates and holding that "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment…[,]" and "governmental regulation of this crucial process [cannot] be exercised consistent with First Amendment guarantees of a free press." *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 258 (1974). Plaintiff attempts to overcome this clear principle by misreading Section 501(c)(3)'s prohibition on covered nonprofits endorsing specific candidates (which Defendants did not do) as an "equal time" requirement. It is not. Moreover, the "equal time" rule Plaintiff appears to have in mind applies to candidates' use of broadcast TV and radio, not to newspapers, and specifically *exempts* "bona fide news interview[s]" with candidates from its requirements. 47 U.S.C. § 315(a)(2). In short, nonprofit newspapers have clear First Amendment rights to determine the scope and timing of election coverage, and Plaintiff's relief would violate those rights.

But even if the requested relief was not in direct contravention of the First Amendment, Plaintiff cannot meet any requirement for the extraordinary remedy of a preliminary injunction. *First*, none of Plaintiff's claims are likely to succeed. His claims are premised largely on a single email stating *The Belmont Voice*'s intention to publish coverage of third-party Senate candidates ahead of the general election. This was not a contract, a binding promise, or the basis for any other kind of civil liability. And even if it were, *The Belmont Voice* held up its end by seeking an interview from Plaintiff, which he rejected in favor of filing this suit. Moreover, Plaintiff fails to even plausibly plead his new claims for federal civil rights violations as, among other deficiencies, none of *The Belmont Voice*'s alleged actions suggest discriminatory animus and it is not a state actor. *Second*, Plaintiff has shown no cognizable harm, much less irreparable harm, that he would suffer absent his requested relief, because the relief is constitutionally barred and, in any event, cannot plausibly turn the Senate race in his favor. *Finally*, the balance of equities and public interest weigh heavily in favor of Defendants, as the damage they would suffer from a deprivation of their constitutional rights, and to their professional reputations as a result, cannot be undone.

In short, this action is inimical to the First Amendment. Plaintiff is entitled to none of his requested relief, even on an interim basis, and his motion should be denied.

## STATEMENT OF FACTS

### A. The Parties

Defendant Belmont News Foundation, Inc. is a Massachusetts nonprofit corporation that publishes the local newspaper and digital outlet *The Belmont Voice*.[1] Dkt. 21 ("First Amended Complaint" or "FAC") ¶ 4; Declaration of Jesse A. Floyd ("Floyd Decl.") ¶ 3. *The Belmont Voice* mainly covers the town of Belmont, Massachusetts, including municipal government, education,

[1] *See* https://belmontvoice.org/ (last visited Oct. 23, 2026).

business, and public safety, and also publishes features on local residents and events. *Id.* ¶¶ 3-4. It will occasionally publish stories that affect a broader geographical area. *Id.* Defendant Jesse A. Floyd is the paper's Editor-in-Chief, and Defendant Sarah Caputo is its Board Chair. *Id.* ¶¶ 1, 7.

Plaintiff Dr. Shiva Ayyadurai is a Belmont resident and an Independent candidate for United States Senate in Massachusetts. FAC ¶ 3.

**B. *The Belmont Voice*'s Election Coverage**

While *The Belmont Voice* generally focuses on local elections, in 2026 it decided to allot some coverage to Massachusetts' statewide Senate campaign. The paper developed a plan for phased coverage. First, the *Voice* interviewed candidates in primary races where incumbents were facing challenges from within their party, including democratic primary opponents, Senator Ed Markey and Rep. Seth Moulton. Floyd Decl. ¶ 6. After the primaries, it published an interview with the Republican nominee, John Deaton, who had not faced a primary challenge and thus was not included in *The Belmont Voice*'s primary coverage. *Id.* The *Voice* then planned to seek interviews with lower polling third-party candidates, including Joseph Tache and Plaintiff Shiva Ayyadurai, with a focus on their reasons for running third-party campaigns. *Id.*

**C. Plaintiff Demands Coverage From *The Belmont Voice***

Plaintiff is a Belmont resident and an Independent candidate for United States Senate in Massachusetts. FAC ¶ 3. On August 21, 2026, after seeing a primary season interview of Senator Ed Markey in *The Belmont Voice*, Plaintiff called the paper and left a voicemail complaining about having not been interviewed. Floyd Decl. ¶ 7. On August 26, 2026, Defendant Jesse Floyd emailed Plaintiff, explaining: "Tuesday is a primary election, and our coverage was focused on candidates facing primary challenges. When we get to the general election, our coverage will expand to include other candidates." FAC Ex. A. Plaintiff replied "Sounds good," and directed Mr. Floyd to his campaign manager and communications director "to setup [an] interview." *Id.* Mr. Floyd

responded: "Thanks much. It will be a week or a bit longer after the primary for us to get sorted." *Id*. That is the entirety of the exchange on which Plaintiff's contract and promissory estoppel claims rest. *See id.* ¶¶ 51-62.

On Friday September 25, 2026, several weeks after primary elections, *The Belmont Voice* published an article about Republican Senate candidate, John Deaton. FAC ¶ 21; Floyd Decl. ¶ 6. At approximately 8:30 that night, Plaintiff emailed Mr. Floyd noting the Deaton article and asking "when we should schedule the interview." Dkt. 1, Fig. 2A.[2] Less than two hours later, before receiving any response, Plaintiff sent a second email to Mr. Floyd, Ms. Caputo, and others, *id.* Fig. 2B, asserting that the timing of *The Belmont Voice*'s coverage "can only mean you have no intent in doing any interview," suggesting that the delay was racially motivated, and demanding that *The Belmont Voice* confirm "by 5:00 PM EST tomorrow" a specific date and time for an interview "that must take place within the next 5 business days." *Id.* If *The Belmont Voice* did not comply, Plaintiff warned, he would file an "emergency complaint for Injunctive Relief," submit a complaint to the IRS, and release the email chain to regional news outlets and community networks. *Id.*

The next day, Saturday, September 26, Ms. Caputo responded: "Our editorial team is planning further coverage of this race and does plan to include your campaign in that coverage. They'll be in touch as their reporting progresses." FAC ¶ 24; Dkt. 1, Fig. 3A.

On Monday, September 28, Plaintiff sent Ms. Caputo, Mr. Floyd, and others an email with the subject line "Racist 'Belmont Voice' Must Be Punished for Violating Multiple Federal Laws." Dkt. 1, Fig. 3B. The email called Defendants "racist scumbags," declared that "[y]ou have broken the Law and you must be punished," threatened federal litigation and IRS proceedings to "revoke

---

[2] Plaintiff's Amended Complaint removes copies of correspondence with Defendants. But since he verified his original Complaint and swore to its accuracy, the Court may treat it as "the functional equivalent of an affidavit." *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991).

your non-profit tax-exempt status," warned that Plaintiff's "global movement of over 3 million followers" would be "made fully aware" of Defendants' supposed racism, and closed with an expletive directed at Defendants and *The Belmont Voice*. *Id.*

Notwithstanding these concerning emails, Defendants followed through on their plan to cover third-party candidates. On October 14, 2026, Mr. Floyd emailed Plaintiff that *The Belmont Voice* was "working on a piece about independent candidates on the Nov. 3 ballot" and posed four questions about Plaintiff's motivation for running, his choice of race, his definition of a successful campaign, and voters' reactions to his campaign. FAC ¶ 26 & Ex. F. Mr. Floyd asked that the answers be "as concise and direct as possible," noted that *The Belmont Voice* "reserve[d] the right to edit for clarity and length," and requested responses by Friday, October 16. *Id.* Ex. F. One of the questions referred to Plaintiff selecting "the state senate as [his] target." *Id.* ¶ 26 & Ex. F.

In response, Plaintiff alleges that the October 14 email constituted a "bad-faith pre-litigation pretext" (FAC ¶ 24; Dkt. 1 Fig. 4), and Mr. Floyd's use of "Mr. Ayyadurai" rather than "Dr. Ayyadurai" reflected "racial gatekeeping." FAC ¶ 26.[3] On October 19, Plaintiff sent Defendants a "pre-litigation notice" declaring that "a standard late Q&A or perfunctory write-up at this stage is legally insufficient," and demanding that Defendants agree by 5:00 p.m. that same day to (1) publish an "expansive, unedited feature profile" of Plaintiff; (2) publish a "top-of-page front-page notice" acknowledging his candidacy and "addressing the failure to provide concurrent non-partisan coverage"; (3) send a "dedicated email broadcast" featuring Plaintiff's "unedited platform" to *The Belmont Voice*'s full subscriber list; and (4) pin the profile and a campaign video to the top of *The Belmont Voice*'s homepage through Election Day. Dkt. 1, Fig. 5. Plaintiff also

[3] In fact, because Plaintiff is not a medical doctor, using the title "Mr." reflected AP Style. *See* https://x.com/APStylebook/status/879776039848693760.

stated that he had filed a complaint about Defendants with the Internal Revenue Service. *Id.* To date, Plaintiff has still not responded with answers to the October 14 emailed questions. Floyd Decl. ¶ 6.

**D. This Lawsuit**

On October 21, Plaintiff, proceeding *pro se*, filed a Verified Complaint asserting breach of contract, promissory estoppel, and claims under M.G.L. c. 12, § 11I/H and M.G.L. c. 93A. *See generally*, Dkt. 1. Plaintiff also moved for a TRO and preliminary injunction, seeking the same relief he demanded on October 19. *See generally*, Dkt. 6. On October 26, 2026, the Court dismissed the action without prejudice for lack of subject matter jurisdiction. Dkt. 25. Hours later, Plaintiff filed the First Amended Complaint, asserting additional claims under 42 U.S.C. §§ 1981, 1983, and 1985(3) and Federal Question jurisdiction under 26 U.S.C. § 1331 (FAC ¶¶ 32-50), and filed a renewed TRO. Dkt. 22 ("Mot."). Plaintiff's new TRO proposes the "compromise" of only forcing the publication of his responses to Defendants' October 14 questionnaire in the same manner and prominence of their coverage of major-party candidates and the publication of a "neutral factual notice" on Defendants' digital homepage "acknowledging" Plaintiff's U.S. candidacy. Mot. at 3.

**ARGUMENT**

Plaintiff Dr. Shiva Ayyadurai asks this Court to compel Defendants to publish and promote coverage about his candidacy for United States Senate on his schedule and in his way. *See* FAC (prayer for relief); Mot. at 3. This relief is prohibited by the First Amendment. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (internal citations and quotations omitted). Consistent with this principle, the Supreme Court has long held that "[l]iberty of the press is in peril as soon as the government tries to compel what is to go into

a newspaper." *Tornillo*, 418 U.S. at 258 & n.24. Indeed, *Tornillo* is dispositive here. There, the Supreme Court unanimously struck down a "right of reply" law requiring newspapers to print candidates' responses to political editorials, holding that a government-compelled "right of access" intrudes on "the function of editors" and that the First Amendment forbids compelling a newspaper to publish "that which reason tells them should not be published." *Id.* at 256, 258 (citation omitted). *See also Affleck v. Harvard Crimson, Inc.*, 2025 WL 330577, at *3 (D. Mass. Jan. 29, 2025) (decisions about what content to publish "are well within the [Harvard] Crimson's traditional editorial functions"), *appeal filed*, (25-1223) (1st Cir. Mar. 5, 2025). An injunction compelling Defendants to make even just one of Plaintiff's requested publications would violate *Tornillo* and fly in the face of Defendants' First Amendment right to editorial discretion over *The Belmont Voice*'s content.

But even if the First Amendment did not completely bar Plaintiff's relief, he is still entitled to none because he does not satisfy the requirements for a preliminary injunction. "A preliminary injunction is an extraordinary remedy" "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 24 (2008). A plaintiff seeking such relief must satisfy every one of the following elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20; *see also Esso Standard Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir.2006). Further, Plaintiff seeks a mandatory injunction which "'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Id*. at 41 (citing *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir.1981)). Plaintiff does not meet any of these requirements: His underlying claims are facially

meritless; he has not shown that he would suffer any irreparable harm absent the press coverage he demands; and both the balance of hardships and the public interest decisively favor Defendants. Plaintiff's motion should be denied in full.

## I. PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

Where "the movant 'cannot demonstrate that he is likely to succeed in his quest," like here, "the remaining factors become matters of idle curiosity.'" *Ayyadurai v. Galvin*, 2026 WL 2409465, at *1 (D. Mass. Aug. 18, 2026) (citing *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)). None of Plaintiff's claims is likely to succeed, especially when balanced against Defendants' own free-speech rights, because he fails to even plausibly allege their elements.

### A. Plaintiff Has No Valid Contract Claims (Counts V and VII)

Plaintiff's breach of contract claim requires him to show "(1) the existence of an agreement supported by consideration; (2) that [Plaintiff] performed its obligations under the agreement; (3) that the defendant breached the agreement; and (4) that [Plaintiff] suffered injury as a result." *Unum Grp. v. Benefit P'ship, Inc.*, 938 F. Supp. 2d 177, 185 (D. Mass. 2013) (citing *Singarella v. City of Bos.*, 342 Mass. 385, 387 (1961)). He cannot show these elements.

*First*, there was no contract. Plaintiff alleges that Defendants "made a clear, written offer of general election coverage." FAC ¶ 52. But the referenced email exchange only explained that "When we get to the general election, our coverage will expand to include other candidates." FAC Ex. A. This was at most a statement of general intention. And "[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract." *Kuzmeskus* v. *Pickup Motor Co.*, 330 Mass. 490, 493 (1953). Defendants made no additional commitments, responding only that it should take "a week or a bit longer after the primary to get sorted." *See* FAC Ex. A. There was not then, and has never been, any discussion of a specific publication timeline, questions, point of view, or "equal coverage." *Id.* Furthermore,

even if these vague communications are sufficient to establish a firm offer, Plaintiff did not provide any consideration whatsoever to turn that offer into a legally binding contract. *Menzone v. Menzone*, 2003 Mass. App. Div. 161, 162 (2003) ("A hope of a benefit is not valid consideration"). Providing his campaign manager's contact information and threatening to sue are not consideration on Plaintiff's part sufficient to convert a statement of general intention into a contract.

*Second*, Plaintiff claims Defendants breached the supposed contract by "failing and refusing to provide candidate coverage, excluding Plaintiff from candidate interviews, and attempting to run out the election clock." FAC ¶ 53. But no interview promise was ever made. And despite Plaintiff's insults and invective, *see* Dkt. 1, Fig. 3B ("F[***] you and the Belmont Voice"), Defendants *still* attempted to interview him on October 14, 2026. See FAC Ex. F. He chose not to respond by the paper's deadline (or later), thereby depriving *himself* the opportunity to have his campaign reported on in *The Belmont Voice*. Any damages he suffered as a result are not Defendants' responsibility. *See Bourgault v. Halben*, 2026 WL 1410725, at *5 (Mass. Ct. App. May 20, 2026) ("Damages not directly traceable to the violation of the contract or which result from other causes are not allowed") (citation omitted).

*Finally*, Plaintiff's new claim for breach of the implied covenant of good faith and fair dealing, FAC ¶¶ 60-62, fails as it "does not give rise to an independent cause of action" and must be dismissed where, like here, there is no contract. *Weekes v. Cohen Cleary P.C.*, 723 F. Supp. 3d 97, 104 (D. Mass. 2024) (citing *Mill-Bern Assocs., Inc. v. Dallas Semiconductor Corp.*, 2002 WL 1340853, at *9 (Mass. Super. Ct. June 13, 2002), *aff'd*, 799 N.E.2d 606 (Mass. App. Ct. 2003)).

**B. Plaintiff Has No Valid Promissory Estoppel Claim (Count VI)**

Plaintiff's promissory estoppel claim is also legally insufficient. "Under Massachusetts law, the elements of promissory estoppel are '(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in

reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 357 (D. Mass. 2010) (citing *Bongaards v. Millen*, 440 Mass. 10, 15 (2003)). In addition, except for consideration, all other elements of a contract must be satisfied. *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995).[4] Plaintiff has not pled this claim.

*First*, as noted above, there was no promise to provide coverage of Plaintiff on his timeline and terms. At most, *The Belmont Voice* agreed to interview Plaintiff and followed through on this.

*Second*, Plaintiff pleads no detriment caused to him in reasonable reliance on Defendants' supposed promise. Plaintiff offers testimony that his campaign "halted active street leafletting outside the local Belmont grocery store" in reliance on *The Belmont Voice*'s purported promise, FAC ¶ 18, but the *Voice* could not have anticipated that Plaintiff, a United States Senate candidate, would change his approach to campaigning because they planned to interview him at some point. If Plaintiff did actually rely in this manner, it would have been unreasonable. Nor can Plaintiff's struggling candidacy be blamed on *The Belmont Voice*. He was polling at 1% a month out from the general election. Floyd Decl. ¶ 6. One local newspaper's editorial decisions were not going to turn the tide for his campaign, and certainly will not lose him this race. In short, his allegations simply do not state a claim for promissory estoppel.

*Finally*, *Cohen v. Cowles*—which concerned promissory estoppel—will not save Plaintiff's claims. *See* FAC ¶ 54. In that case, there was no question that a promise had been made, and that the plaintiff had acted in reliance on that promise. *Cohen v. Cowles Media Co*., 501 U.S.

---

[4] Importantly, Plaintiff's promissory estoppel claim is foreclosed by his assertion that he and Defendants are parties to a valid contract. *See Malden Police Patrolman's Ass'n v. Malden*, 92 Mass. App. Ct. 53, 61 (2017) ("Where an enforceable contract exists ... a claim for promissory estoppel will not lie.").

663, 665 (1991) ("Cohen made clear to the reporters that he would provide the information only if he was given a promise of confidentiality. Reporters from both papers promised to keep Cohen's identity anonymous and Cohen turned over copies of two public court records..."). Here, there were no promises, no reasonable reliance, and no detriment.

### C. Plaintiff Has No Valid Unfair and Deceptive Trade Practices Claim Pursuant to M.G.L. c. 93A (Count VIII)

Liability under Section 93A requires conduct that "(1) falls within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers or other business persons." *In re Daniel*, 568 B.R. 162, 175 (Bankr. D. Mass. 2017). Because Plaintiff has not established essential elements of this claim, he is unlikely so succeed on its merits.

*First*, Section 93A 9.3 requires specific notice of a deceptive trade practices claim under that statute 30 days before filing an action. Mass. Gen. Laws Ann. ch. 93A, § 9.3. Plaintiff did not make such a written demand that identified any deceptive trade practices.

*Second*, *The Belmont Voice*'s exercise of editorial discretion in deciding when and how to publish coverage of the midterm elections and participating in joint interviews with other local newspapers, *see* FAC. ¶¶ 20-24, does not amount to engaging in actionably deceptive conduct. "[T]he publication and sale of newspapers is a private enterprise as distinguished from a business affected with public interest and ... those engaged in such a business are free to deal with whomever they choose." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 594 (1975). "[A] refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L. c. 93A." *Id.* at 599 (regarding newspaper's decision not to run certain ads); *see also White v. Bos. Phoenix, Inc.*, 1993 WL 818707, at *3 (Mass. Super. Nov. 23, 1993); *Chiodini v. Target Mktg. Grp., Inc.*, 58 Mass. App. Ct. 376, 378 (2003) ("It is generally

recognized that in the absence of any purpose to create or maintain a monopoly, a newspaper, … is free to deal with whomever it chooses.”). There is no allegation, nor could there be, that *The Belmont Voice* acted to restrain trade, and Plaintiff’s Section 93A claim therefore fails.

*Third*, Plaintiff identifies no “immoral, unethical, oppressive, or unscrupulous” conduct, as required for this claim, especially as Defendants *did* attempt to interview Plaintiff. “Every deal that goes sour does not give rise to a G.L.c. 93A claim,” *LJA Corp. v. Farace*, 1995 WL 808668, at *5 (Mass. Super. Mar. 14, 1995) (citing *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 600 (1979), citing *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)), and a “mere breach of contract is insufficient to establish Ch. 93A liability.” *Gerli v. G.K. Hall & Co.*, 851 F.2d 452, 454 (1st Cir. 1988). Plaintiff has identified no wrongful conduct.

### D. Plaintiff Has No Valid Claim Under 42 U.S.C. §§ 1981 (Count I)

To state a claim under 42 U.S.C. § 1981(a), Plaintiff must plausibly allege that (1) he is a member of a racial minority; (2) Defendants intended to discriminate against him on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, such as the making and enforcing of contracts. *See Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013). Plaintiff must also identify an existing or prospective “contractual relationship” under which he “[has] rights,” *Domino’s Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006), and ultimately prove that race was a but-for cause of his injury, *Comcast Corp. v. Nat’l Ass’n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020). Plaintiff cannot satisfy these requirements.

*First*, the Section 1981 claim fails at the threshold because there was no contract. *See infra* Section II.A. Without an underlying contractual relationship, there is nothing for Section 1981 to protect. *Domino’s Pizza*, 546 U.S. at 476, 479-80 (finding no claim under Section 1981 where plaintiff failed to allege a contract under which he had rights).

*Second*, Plaintiff does not plead any facts tending to show that racial animus was the but-for cause of Defendants' alleged breach. Indeed, the only "evidence" of animus Plaintiff identifies is that Defendants' litigation papers described his emails as "aggressive" and "concerning" (FAC ¶¶ 28-29, 36), that *The Belmont Voice*'s editor addressed him as "Mr." and mistakenly referred to a "state senate" race (*id.* ¶ 26), and that a financial backer of the paper is a neighbor with whom Plaintiff has a long-running political dispute (*id.* ¶ 30).[5] None of this suggests *racial* motivation, and Plaintiff cannot plausibly plead otherwise by sheer insistence. *Rivera v. Costco Wholesale Corp.*, 2026 WL 1180480, at *21 (D.P.R. Jan. 29, 2026) (collecting cases dismissing Section 1981 claims absent competent evidence of racial animus). Accurate descriptions of Plaintiff's expletive-laden accusations and legal threats made in a court filing made *after* Plaintiff sued are not evidence of a racial motive. *See* Dkt. 1, Fig. 3B. And a political feud, by Plaintiff's own account, reflects "political animus," FAC ¶ 30, not racial animus. Even if Plaintiff *had* plausibly alleged a racial motivation, he cannot show it was a but-for cause of the *Voice*'s decision not to publish the coverage he wanted: Defendants followed a straightforward editorial plan, covering primary challenges, major candidates, and then low-polling third-party candidates. Floyd Decl. ¶ 6. That is a newsroom sequencing its election coverage on the basis of objective metrics, not racial discrimination. *See Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999) (plaintiff must "must offer evidence showing that the defendant's proffered reason is a sham, and that discriminatory animus sparked the defendant's actions" in light of non-discriminatory explanation for a Sec. 1981 defendant's conduct).

[5] While not necessary to resolve this motion, the neighbor identified in Plaintiff's Complaint was not involved in "incubat[ing]" or "found[ing]" The Belmont Voice and has no role in its governance. *See id*.

### E. Plaintiff Has No Valid Claim Under 42 U.S.C. § 1985(3) (Count II)

Plaintiff's 1985 claim similarly fails on multiple fronts. "[T]o state a claim under § 1985(3), a plaintiff must plausibly allege: (1) a conspiracy, (2) a conspiratorial purpose to deprive a class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 24 (1st Cir. 2025) (citation omitted), *pet. for cert. filed*, (No. 25-1404) (U.S. June 22, 2026). "Furthermore, a plaintiff may recover only when the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* And because Plaintiff relies on the statute's federal-election clause, he must also allege a conspiracy to prevent support or advocacy "by force, intimidation, or threat." 42 U.S.C. § 1985(3).

*First*, and as with his § 1981 claim, Plaintiff has failed to plead class-based animus. The count itself asserts only that Defendants sought to "promote Republican candidate John Deaton" and "bolster the establishment duopoly," FAC ¶¶ 31, 41—that is, it alleges partisan or political motivation, not racial animus. The Supreme Court has refused to extend Section 1985(3) beyond invidious class-based discrimination, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993), and an alleged preference for one candidate's campaign over another's does not qualify. *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 109 (1st Cir. 2008) ("[Section] 1985(3) provides no remedy for animus on the basis of political beliefs."); *Reyes v. Municipality of Guaynabo*, 59 F. Supp. 2d 305, 310 (D.P.R. 1999) ("Being a member of a political party does not constitute a protected class envisioned by Congress when it created Section 1985(3)").

*Second*, as to conspiracy, Plaintiff's theory is that Mr. Floyd attended a joint interview of Republican nominee John Deaton with five other local nonprofit newsrooms—a means of making

the interview worth the candidate's time due to the combined circulation of the local outlets—and that this "pooled" interview was a "coordinated blackout" of Plaintiff. FAC ¶¶ 20-22, 41-42. But Plaintiff must "allege facts that would permit [the court] plausibly to infer an agreement among the defendants, motivated by some discriminatory animus, to deprive the plaintiff of [his] right[s]." *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019). The fact that several outlets jointly interviewed a major party candidate is patently insufficient to support such an inference, and conclusory labels such as "syndicate" and "cartel" do not substitute for facts. *See id*. (affirming dismissal where complaint was "devoid of facts that would warrant … an inference" of an actionable conspiracy); *Schiff v. IRS*, 2026 WL 699650, at *1, *5 (D.P.R. Mar. 12, 2026) (dismissing Section 1985(3) claim against news publishers arising from their supposed "colluding" with sources to publish "unsubstantiated information" for failure to adequately allege conspiracy). Holding otherwise would make all decisions about how to most effectively cover elections fraught with legal risk, creating a severe chill on political journalism.

*Third*, Plaintiff alleges no qualifying civil rights interference. He alleges interference with voters' rights by "force, intimidation, or threat," FAC ¶ 40, but the only conduct he identifies in support of this claim is *The Belmont Voice* purportedly "coordinat[ing]" to exclude him from the same level of press coverage given to a major party candidate. *Id*. ¶ 41. This does not identify any interference with *voters'* rights of advocacy or support at all, much less with the requisite "force, intimidation, or threat." 42 U.S.C. § 1985(3).

### F. Plaintiff Has No Valid Claim Under 42 U.S.C. § 1983 (Count III)

"Section 1983 furnishes a private right of action against any person who, while acting under color of state law, deprives another … of rights secured either by the Constitution or by federal law." *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 543 (1st Cir. 2021). Where the challenged conduct "cannot be classified as state action, a 1983 claim necessarily fails." *Id.* And

courts recognize that since "[n]ewsgathering is the quintessential private activity, jealously guarded from impermissible government influence," news outlets cannot be easily classified as state actors. *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1214 (9th Cir. 2002).

Plaintiff attempts to avoid the state action requirement by invoking the "entwinement doctrine" articulated in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 297-304 (2001). Under this doctrine, "public entwinement in the *management* and *control* of a private entity can create a basis for state action, but the requisite entwinement exists only when government actors manage or exercise control over a nominally private entity." *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 248 (1st Cir. 2012) (internal quotations and citations omitted) (emphasis added). But as Plaintiff admits, Defendant Belmont News Foundation, Inc. is owned, operated, and managed by *private* Massachusetts citizens who Plaintiff describes only as "white legacy figures" (FAC ¶ 29) rather than "state actors" as the law requires. Its tax-exempt status does not change the analysis: Receiving tax benefits or being regulated by the government does not convert a private entity into a state actor. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812-16 (2019) (private nonprofit operating public access channels was not a state actor despite being heavily regulated). In short, Plaintiff cannot prevail on his Section 1983 claim because there was no state action.

### G. Plaintiff Has No Valid Claim Under 28 U.S.C. § 1331 (Counts IV)

Plaintiff asserts a claim for "Substantial Embedded Federal Question Under 28 U.S.C. § 1331 (Grable Doctrine)," FAC ¶¶ 47-50 (Count IV), but this is a theory of jurisdiction, not a cause of action. Nor would Plaintiff prevail on his underlying federal question—"whether the term 'coverage' incorporated federal 501(c)(3) candidate neutrality mandates under 26 U.S.C. § 501(c)(3) and IRS Revenue Ruling 86-95 [prohibits] the publication of candidate profiles without equal presentation of to all qualified candidates." *Id.* ¶ 50.

Initially, there is no private right of action to sue an entity over its tax-exempt status, nor does Plaintiff have standing to challenge that status arising from his concocted and unconstitutional "equal coverage" violation. In *Fulani v. Brady*, 935 F.2d 1324, 1329-30 (D.C. Cir. 1991), the D.C. Circuit rejected this approach, holding that a third-party political candidate lacked standing to sue the IRS to challenge the tax-exempt status of the Commission for Presidential Debates based on it excluding her from a presidential debate it hosted, because her injury could not be traced to the IRS's granting of tax-exempt status to the Commission. *Id.* Moreover, Defendants did not violate Section 501(c)(3), which provides that covered entities cannot "participate in, or intervene in … any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). Section 501(c)(3) does not, by any measure, nationalize nonprofit newspapers into public fora required to publish the platforms of third-party political candidates on their terms. *See Maher v. Sun Publications, Inc.*, 459 F. Supp. 353, 355 (D. Kan. 1978) (newspapers are not subject to public television broadcast "equal time" obligations); *Affleck*, 2025 WL 330577, at *3 (nonprofit student newspaper had a First Amendment right to editorial discretion). Nor did Defendants run afoul of Section 501(c)(3): They did not intervene on behalf of or against any particular candidate, but published coverage of *both* major party candidates, and planned additional coverage of third-party candidates. Floyd Decl. ¶ 6. By contrast, the relief *Plaintiff* demands—highjacking *The Belmont Voice* for his political use—is directly contrary to Section 501(c)(3). *See* IRS Revenue Ruling 86-95 (1986) (noting that "propaganda" or "the publication or distribution of written statements ... on behalf of or in opposition to such a candidate" would violate IRS requirements).

In short, Plaintiff has failed to even plead—much less show a likelihood of success on—any of his pled claims. This is sufficient grounds to deny his motion.

## II. PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

The burden of demonstrating irreparable harm rests "squarely upon the movant." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996). "The strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," meaning a lesser chance of success requires a higher showing of harm. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (citing *Mass. Coal. of Citizens with Disabilities*, 649 F.2d at 75). Because his claims lack merit, Plaintiff must make a significant showing here and fails to do so:

*First*, Plaintiff has no legally cognizable right to coverage in *The Belmont Voice*, so its decision not to cover him in the manner he prefers cannot inflict a legally cognizable injury, let alone an irreparable one. "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone.' That principle still holds true." *Halleck*, 587 U.S. at 813 (citation omitted). *See also Tornillo*, 418 U.S. at 258.

*Second*, any harm Plaintiff claims is of his own making. *The Belmont Voice* invited Plaintiff to participate in "a piece about independent candidates on the Nov. 3 ballot" on October 14. FAC Ex. F. Plaintiff did not answer Mr. Floyd's questions by the stated deadline (or later), thereby declining to participate in the coverage *The Belmont Voice* planned. Floyd Decl. ¶ 8. In short, any irreparable harm Plaintiff might suffer is the result of his own choices.

*Third*, Plaintiff's theory of irreparable harm is premised on speculation that he could win his Senate campaign if a single township's local paper was forced to publish favorable coverage of him. *See* Mot. at 1. But "speculative" or "tenuous" harm is insufficient; a movant must show a real and imminent injury. *Ross-Simons*, 102 F.3d at 19. *See also City of Chelsea v. Trump*, 802 F. Supp. 3d 289, 296 (D. Mass. 2025) (theory of irreparable harm was "implausible" where the ultimate result plaintiffs sought was "already fraught with unpredictability"). Because Plaintiff

cannot show that he would win his race given the requested relief, he fails to show irreparable harm absent it.

## III. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN FAVOR OF DEFENDANTS

Injunctive relief should be denied also because the harm to Defendants that would result from issuing the requested injunction—a restraint on Defendants' ability to publish speech of their choosing—far outweighs the harm to Plaintiff.

*First*, as set out above, an injunction requiring Defendants to publish the content Plaintiff demands would violate their First Amendment Rights, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("[i]t is well established that the loss of first amendment freedoms constitutes irreparable injury."). Plaintiff's requested relief would also operate as a restraint on Defendants' speech by commandeering "space that could be devoted to other material the newspaper may have preferred to print." *Tornillo*, 418 U.S. at 256-57. *See* Floyd Decl. ¶¶ 4-5, 10. The requested relief thus comes with "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Accordingly, Defendants would suffer profound constitutional injury if subjected to the relief Plaintiff demands.

*Second*, the requested relief would do practical harm to *The Belmont Voice*. Plaintiff proposes that *The Voice*, a local nonprofit paper, is legally obligated to publish comprehensive coverage of all candidates whenever they cover an election. But this would be practically unworkable given the paper's limited resources. Floyd Decl. ¶ 10. It would also threaten the paper's reputation for independence and fairness. Floyd Decl. ¶ 11. Allowing a third party to dictate the form and content of Defendants' journalism would be antithetical to its mission and

erode the trust the paper has built with its audience. *Id.* The damage to Defendants' constitutionally protected editorial discretion and its resources and reputation from an injunction would be substantial, tilting the balance of hardships decisively in Defendants' favor.

## IV. THE PUBLIC INTEREST STRONGLY FAVORS DEFENDANTS

The public interest also weighs heavily against an injunction in this case. The Supreme Court has properly cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Here, in addition to protecting Defendants' First Amendment rights, the denial of Plaintiff's injunction would preserve the public's interest in receiving news from independent outlets that can exercise their editorial judgment free from improper interference. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information."). This would further the goals of the First Amendment, by securing "the paramount public interest in a free flow of information to the people concerning public officials, their servants." *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964). *See also Yes for Life Political Action Comm. v. Webster*, 74 F. Supp. 2d 37, 43 (D. Me. 1999) (The public interest is served by protecting First Amendment rights from interference). Plaintiff's motion is nothing more than an attempt to coerce and compel a third party's speech, in violation of constitutionally enshrined public policy. His request for an injunction should be rejected.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff any form of injunctive relief in this action.

Dated: October 27, 2026

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

By: */s/ Rachel F. Strom* .
Rachel F. Strom
1251 Avenue of the Americas,
42nd Floor
New York, NY 10020
Telephone: (212) 603-6455
Fax: (212) 489-8340
RachelStrom@dwt.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the within document was filed through the CM/ECF system and served via email and via Overnight Mail to Plaintiff Dr. Shiva Ayyadurai at the below address:

Dr. Shiva Ayyadurai,
Plaintiff *Pro Se*
701 Concord Avenue
Cambridge, MA 02138
vashiva@cytosolve.com

Dated: October 27, 2026

/s/ *Rachel F. Strom*
Rachel F. Strom