**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE
2026 OCT 28 A 11: 08
U.S. DISTRICT COURT
DISTRICT OF MASS.

DR. SHIVA AYYADURAI,

Candidate for United States Senate,

*Plaintiff,*

*v.*

BELMONT NEWS FOUNDATION, INC, (d/b/a THE BELMONT VOICE); JESSE A FLOYD, Editor-in-Chief; and SARAH CAPUTO,

*Defendants.*

Civil Action No. 1:26-cv-14760-ADB

**PLAINTIFF'S REPLY IN SUPPORT OF RENEWED EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Dr. Shiva Ayyadurai ("Dr.SHIVA") submits this Reply in support of his Renewed Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 22), directly refuting the bad-faith misrepresentations set forth in Defendants' Memorandum in Opposition (ECF No. 26) and the Declaration of Jesse A. Floyd (ECF No. 27).

**PRELIMINARY STATEMENT**

This action arises from a calculated bait-and-switch executed in bad faith. On August 26, 2026, Defendants entered into an agreement **"to setup interview" (Exhibit A)** with Plaintiff - a prominent, MIT-educated, world-renowned systems scientist, the inventor of email, independent candidate of color and longtime Belmont resident living within walking distance (3,000 feet) from their newsroom. The record demonstrates that Defendants never possessed any genuine intention of honoring that agreement.

Instead, Defendants operated on an unconstitutional double standard: while actively marshaling a multi-town newsroom syndicate to conduct a spoken, interactive joint interview and provide expansive feature coverage to white establishment candidates, Defendants subjected Plaintiff to a 49-day wall of silence during the height of early voting. When Plaintiff insisted on the performance of his contract, Defendants attempted to dismiss his assertion of rights as "aggressive," subjected him to bad-faith tone policing, and ultimately tendered an insulting, 4-question email questionnaire for a nonexistent "state senate" seat **(Exhibit C)**.

Defendants attempt to excuse this disparate treatment by citing a 1% commercial poll metric, willfully blinding themselves to the non-partisan UMass Amherst Poll documenting Plaintiff at 8% statewide and 15% and upward among independent voters. Under *42 U.S.C. § 1981* and *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), the First Amendment does not grant a *501(c)(3)* newsroom a license to enter contracts in bad faith, break promises with impunity, and enforce racial double standards against independent minority contenders.

**I. THIS ACTION IS ABOUT A BREACHED CONTRACT AND PROMISSORY FRAUD UNDER *COHEN*, NOT COMPELLED SPEECH UNDER *TORNILLO***

Defendants dedicate twenty pages of their Opposition to constructing a constitutional strawman, hiding behind *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), to argue that the First Amendment confers an absolute license on editors to make binding promises, break them with impunity, and violate federal civil rights statutes. This is not a *Tornillo* case. Plaintiff does not seek to enforce an unconstitutional, statutory "right-of-reply" on an uncommitted newspaper.

This action is governed squarely by the controlling Supreme Court precedent of ***Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)**. In *Cohen*, the Supreme Court established that the First Amendment does **not** grant news organizations immunity from laws of general applicability, specifically upholding liability for promissory estoppel and breach of promise:

*"[T]he First Amendment does not confer on the press a constitutionally protected right to disregard promises that would otherwise be enforced under state law... The press may not, with impunity, break promises made to members of the public."* Cohen, 501 U.S. at 669–70.

Defendants made an explicit, enforceable contractual commitment to Plaintiff. Plaintiff relied upon that agreement to his substantial, irreparable detriment. Under *Cohen*, Defendants cannot invoke the First Amendment to shield themselves from promissory fraud and civil rights violations.

**II. THE TWO PILLARS OF THE CONTRACT:**
**"TO SETUP INTERVIEW" AND "FULL, EQUAL COVERAGE"**

Defendants make the demonstrably false assertion to this Court that *"no interview promise was ever made"* and that there was *"never... any discussion of... 'equal coverage.'"* (*Opposition at 8, 9*).

Defendants' own exhibits and sworn filings completely refute their counsel's manufactured narrative. The agreement between the parties was founded upon two clear, undeniable contractual terms: 1) **an <u>interview</u>**; and, **2) <u>full</u>** and **<u>equal coverage</u>**.

**A. "To Setup Interview" (Exhibit A): Floyd Agreed to an Interview - Never an Email Questionnaire (Exhibit C) -** The August 26, 2026 written email exchange establishes the meeting of the minds beyond dispute:

1. **Defendant Floyd's Offer:** Floyd explicitly wrote: *"When we get to the general election, our coverage will expand to include other candidates."*

2. **Plaintiff's Acceptance and Express Operational Condition:** Plaintiff replied: *"Sounds good,"* and explicitly dictated the logistics: **"Reach out to Mike Mosca - our campaign manager or Crystal Ellis - our dir of communications to SETUP INTERVIEW." (Exhibits A, F)**
3. **Defendant Floyd's Direct Assent:** Floyd directly assented in writing: **"Thanks much. It will be a week or a bit longer after the primary for us to get sorted."**

**"TO SETUP INTERVIEW" MEANT AN INTERVIEW - NOT A QUESTIONNAIRE.** In the English language, in standard business dealings, and in journalistic practice, agreeing to coordinate with a campaign manager and communications director "to setup interview" means a **live, spoken interview** - the identical format accorded to Democrat Ed Markey and Republican John Deaton.

This entire interaction was conducted in the direct context of an **interview**. It was never about a perfunctory questionnaire (Exhibit C). It was never about an email form. Floyd agreed to an **interview**. He responded *"Thanks much"* to an instruction to set up an interview with Dr.SHIVA's staff. At no point in August or September did Floyd ever utter the word "questionnaire" or state that Dr.SHIVA would be denied a live interview. Floyd made it very clear that the interview would be scheduled a "a week or a bit longer."

**B. Forty Years of Industry Custom & Trade Usage: "Interview" Has Never Meant an Email Questionnaire** - Under long-settled contract law, the terms of an agreement and the reasonableness of reliance are interpreted according to **course of dealing, trade usage, and established industry custom**.

For more than **forty years**, Plaintiff Dr.SHIVA has engaged extensively with national and international media. He has been interviewed by *The Wall Street Journal*, *The New York Times*, *MIT Technology Review*, *CBS Television Network*, and dozens of major broadcast and print publications across the globe. Throughout that four-decade career, an agreement "to setup interview" has always meant a **live, spoken Q&A interview** - whether in-person, by telephone, or on camera.

Never once in forty years has any legitimate news organization agreed to "setup an interview," stalled for seven (7) weeks, and then claimed that sending a 4-question email (Exhibit C) with an arbitrary 48-hour deadline constituted the agreed-upon "interview." Plaintiff's Communications Director, Crystal Ellis, who has managed press relations across numerous public campaigns and media cycles, shares this identical professional reality: **neither Dr.SHIVA nor Ms. Ellis has ever witnessed a newsroom engage in such a deceitful bait-and-switch. (Exhibit F)**

Floyd's post-hoc attempt to redefine "interview" as an eleventh-hour email questionnaire flies in the face of universal industry practice and confirms the fraudulent intent underlying Defendants' conduct.

**C. "Coverage" Always Meant FULL, EQUAL COVERAGE** - Defendants' claim that "coverage" did not mean "equal coverage" is legally and factually bankrupt:

1. **The Context of Parity:** Dr.SHIVA initiated contact after *The Belmont Voice* published a dedicated, solo profile of Ed Markey. Floyd's promise that general election coverage would *"expand to include other*

*candidates"* was an explicit representation that certified general election contenders would receive **full, equal coverage**.

2. **The 501(c)(3) Mandate:** *The Belmont Voice* is an IRS-recognized *501(c)(3)* tax-exempt public charity (FAC ¶ 4). Under *26 U.S.C. § 501(c)(3)* and IRS Revenue *Ruling 2007-41*, a tax-exempt entity engaged in voter education is strictly barred from intervening in campaigns or according preferential, disparate treatment to select candidates. When a *501(c)(3)* news organization promises a certified candidate "coverage," that promise inherently carries the legal obligation of **full, equal, non-partisan** coverage.

**D. Defendant Caputo Confirmed Both Commitments in Writing** - When Plaintiff followed up following the paper's exclusive feature of Republican John Deaton, Defendant Sarah Caputo (Board Chair) stepped in to reaffirm the agreement. On September 26, 2026, Caputo wrote: *"Our editorial team is planning further coverage of this race and does plan to include your campaign in that coverage. They'll be in touch as their reporting progresses."* (Exhibit B). Caputo did not say the agreement had changed. She did not say an interview was off the table. She reaffirmed that the campaign would be included in the race's coverage. Both individual defendants affirmed the agreement: **an interview** and **full, equal** coverage.

## III. THE FOUR-PRONG LITMUS TEST: PLAINTIFF ESTABLISHES AN ENFORCEABLE CONTRACT UNDER MASSACHUSETTS LAW

Defendants attempt to evade liability by asserting that Plaintiff cannot establish the basic elements of a contract (Opposition at 8). Citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961), Defendants identify the four requirements under Massachusetts law: (1) an agreement supported by consideration; (2) performance by the plaintiff; (3) breach by the defendant; and, (4) resulting damages. Plaintiff satisfies **every single prong**:

**1. Prong One: An Enforceable Agreement Supported by Valid Consideration**

- **Offer and Acceptance:** On August 26, 2026, Defendant Floyd made an express written offer of general election coverage. Plaintiff accepted and provided explicit operational terms: "Reach out to Mike Mosca - our campaign manager or Crystal Ellis - our dir of communications **to SETUP INTERVIEW**." (Exhibits A, F) Defendant Floyd assented in writing: "Thanks much. It will be a week or a bit longer after the primary for us to get sorted." Both parties agreed on the subject matter: an interview in connection with general election coverage.
- **The Quintessential Belmont Feature Story:** In Paragraph 3 of his sworn declaration, Floyd defines the core mission of *The Belmont Voice*: "features on local residents and events." (Floyd Decl. ¶ 3). *The Belmont Voice* routinely expends print space profiling local Belmont youth hockey teams, local high school athletes, and neighborhood shopkeepers. Yet Defendants brazenly argue that securing an exclusive, in-depth feature profile with a **world-renowned Belmont resident**, an MIT-educated scientist holding four degrees, the inventor of email, an independent candidate of color, and a certified candidate for the United States Senate living 3,000 feet, a 10-minute walk from their newsroom - has zero editorial or commercial value. An interview with Dr.SHIVA is the ultimate high-interest local feature, driving

precisely the digital impressions, page views, and ad reads that Floyd swears fund their 12-page weekly paper.

- **The Tangible Financial Value of Expert Candidate Time:** In contractual quantum meruit and consideration doctrine, time is property. Dr.SHIVA is a systems scientist, technologist, and senior consultant whose professional time bills at $2,585.00 per hour.
  - When Dr.SHIVA agreed on August 26, to dedicate his time and direct his campaign manager and communications director to schedule a live interview, he agreed to provide hours of high-value professional labor, proprietary candidate platform analysis, and exclusive likeness rights.
  - Defendants concede on pages 14–15 of their brief that candidate time is an economic asset requiring negotiation, admitting they had to pool six newsrooms just to "mak[e] the interview worth the candidate's time due to the combined circulation." (Opp. at 14–15).
  - Defendants cannot claim on page 14 that candidate time possesses measurable commercial value when scheduling a white man John Deaton, while simultaneously claiming on page 8 that securing the time and content of a brown man Dr.SHIVA represents zero consideration. Dr.SHIVA's commitment of time and exclusive access provided substantial, bargained-for consideration under Massachusetts law.
- **Measurable Digital Traffic and Audience Reach:** Defendants' assertion that securing an interview with Plaintiff carried zero editorial or economic value is refuted by modern digital media economics. In the digital news industry, exclusive access to prominent figures directly generates web impressions, click-through rates, and digital ad revenue. Dr.SHIVA commands an active, verified following exceeding 3,000,000 individuals across digital platforms - a reach surpassing both establishment opponents combined. For a startup publication seeking to build digital circulation and fund its operations, securing exclusive interview content and digital likeness rights from an internationally recognized figure with multi-million-follower reach represents substantial, bargained-for commercial consideration, completely undermining Defendants' claim that scheduling an interview was a mere gratuitous burden.

**2. Prong Two: Plaintiff Performed All Obligations Under the Agreement**

- Plaintiff performed fully: he designated his campaign manager and communications director, provided their contact information, and held campaign time and scheduling in active readiness for Floyd to fulfill his timeline *"a week or a bit longer after the primary."*
- When Defendants published Deaton on September 25, Plaintiff **immediately followed up** to schedule the agreed-upon interview. At all times, Plaintiff stood ready, willing, and able to sit for the **live spoken interview** Floyd agreed to set up.

**3. Prong Three: Defendants Materially Breached the Agreement -** Defendants breached the contract through bad faith, stall tactics, and an unworkable bait-and-switch:

- **49-Day Delay:** Defendants sat completely silent for 49 days while actively coordinating multi-paper syndicated interviews for major-party candidates.
- **Bait-and-Switch:** After agreeing to "setup interview," (Exhibit A) Floyd refused to conduct a live spoken interview and instead sent an insulting, 4-question email on October 14. An email questionnaire is not an interview. (Exhibit C).
- **Constructive Breach via Unworkable Terms:** Floyd demanded a 48-hour turnaround over a weekend, demonstrated disqualifying ignorance by asking about a nonexistent run for the "**state senate**," and unilaterally inserted a censorship rider ("reserve the right to edit for clarity and length") that destroyed the benefit of the bargain.

**4. Prong Four: Direct Causation, Quantified Reliance & Mathematical Proof of Damages** - Defendants attempt to trivialize Plaintiff's detrimental reliance, mockingly describing the campaign's forbearance as merely *"halt[ing] active street leafletting outside the local Belmont grocery store"* and claiming any resulting injury is *"speculative"* (Opposition at 10, 18). Plaintiff's operational injury is not speculative; it is **quantified with mathematical precision, monitored using a daily dynamic and scientific dashboard that enables tracking of flyer distribution by towns, and reviewed EVERYDAY at 7:00PM EST**:

- **The Systematic Field Ground Game:** Operating on rigorous systems-engineering principles, Dr.SHIVA's campaign tracks voter contact and literature distribution with daily ledger accounting. Every evening at 7:00PM EST, precisely, field operatives and campaign volunteers assemble for debriefs to audit literature inventory, verify precinct coverage, and log flyer distribution counts against voter registration lists. It is done with intense attention to detail and all volunteers must attend and report. Volunteer engineers analyze the results and then decide deployments for the next day. Leafleting and getting on media is the core of the entire campaign. **(Exhibit G)**. To trivialize and mock this reveals the arrogance of the defendants and reckless disregard for Dr.SHIVA's campaign and volunteers, a disrespect not provided to two White men: Markey and Deaton.
- **The 12,000-Household Mathematical Calculation:** Prior to Defendants' August 26 commitment, the campaign scheduled a dedicated 20-day ground operation targeting Belmont's residential precincts. Full-time campaign field operative Noel Arellano was assigned to distribute the campaign's official 1-page double-sided platform flyer (attached hereto as **Exhibit G**).
- **Daily Distribution Capacity:** Operating at an audited rate of **600 flyers per day,** Noel was scheduled over a 20-day deployment to deliver **12,000 flyers at Belmont grocery store on Trapelo Road** (20 days × 600 flyers/day = 12,000 households).
- **The Stand-Down in Detrimental Reliance:** In Paragraph 4 of his declaration, Floyd swears that *The Belmont Voice* delivers a physical print paper free of charge **weekly to every single household and business in Belmont - approximately 11,000 homes in total.** In direct reliance upon Floyd's August 26 representation that the paper's universal print run to 11,000 Belmont doors would feature the U.S. Senate candidates, the

campaign made the operational decision to conserve resources, avoid redundant print costs, and reassign Noel to other municipalities.

- **The Net Harm:** The campaign halted the Belmont field deployment after distributing only **975 flyers**. Because Defendants strung the campaign along for **49 consecutive days** (August 26 to October 14) before executing their bad-faith bait-and-switch, the campaign was denied the ability to reach **more than 11,000 Belmont households** during the precise window when early mail-in ballots were printed, mailed, and cast: 11,025 UnreachedBelmontHouseholds = PlannedFieldReach (12,000) - ActualDistribution(975)

By breaching their agreement and running out the clock, Defendants stripped Plaintiff of access to over 11,000 households in his own hometown - an operational injury that money damages cannot remedy days before the election.

**Alternative Pleading Shield: Fed. R. Civ. P. 8(d)(2)**

Under **Federal Rule of Civil Procedure 8(d)(2)**, a plaintiff is entitled to plead claims in the alternative. Even if the Court were to adopt Defendants' formalistic view that candidate access is not traditional consideration for a contract, **Count VI for Promissory Estoppel under *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), independently survives and requires equitable enforcement**. In *Cohen*, the Supreme Court enforced a news organization's broken promise under promissory estoppel precisely because traditional contractual consideration was absent.

## IV. THE PHYSICAL REALITY & REAL-WORLD BROADCAST COMPS DEMOLISH THE "LIMITED RESOURCES" SHAM

Defendants swear under penalty of perjury that conducting an interview with Dr.SHIVA was an "unworkable" burden due to their "limited staff of three" (Floyd Decl. ¶¶ 3, 9–10; Opp. at 19). This defense collapses entirely when viewed against physical proximity and how actual media outlets operate:

**1. Plaintiff Lives 3,000 Feet, 10-Minute Walk From Defendants**

- Dr.SHIVA is a Belmont resident who lives approximately 3,000 feet away from *The Belmont Voice's* offices - a 3-minute drive or 10-minute walk.
- Yet, Defendants claim that walking across the street to interview a neighbor and certified federal candidate was an unmanageable logistical burden.
- Meanwhile, *The Belmont Voice* found the resources, cameras, and staff to travel and coordinate across **six different municipalities** to produce an expansive, hour-long interview for John Deaton.

**2. Regional Media Comparators Demolish the "Burden" and "Limited Resources" Pretext**

The standard of basic journalistic feasibility and candidate parity is demonstrated by comparable regional outlets operating with equal or fewer resources:

- **Fitchburg FM Radio Demonstrates Feasibility and Custom:** Immediately following an interview with Republican candidate John Deaton, a local Fitchburg FM radio station scheduled an hour-long candidate interview with Dr.SHIVA for the very next day. While broadcast stations operate under distinct regulatory frameworks regarding equal opportunities, Plaintiff does not cite this station to import statutory FCC regulations onto a print medium. Rather, this real-world comparator serves as direct proof of **industry custom, manageable administrative burden, and journalistic parity**.
- **The Reality of Operational Capacity:** This for-profit Fitchburg station operates on a budget and full-time editorial staff smaller than non-profit The Belmont Voice and does not possess anywhere near the prominent commercial real estate occupied by Defendants on Leonard Street in Belmont. If a small, resource-constrained regional radio newsroom can seamlessly coordinate, host, and air an hour-long spoken interview within 24 hours of interviewing a major-party rival, Defendants' sworn assertion that walking 3,000 feet to interview an eminent Belmont neighbor imposed an "unworkable administrative burden" is demonstrably false and purely pretextual. (Plaintiff stands ready to provide a sworn affidavit from the Fitchburg station producer confirming these operational facts upon this Court's request).

**3. WWLP-22News TV in Springfield & Northeastern Gospel FM Radio -** During these identical campaign weeks, other regional outlets demonstrated standard journalistic integrity:

- Plaintiff traveled over two hours west to **WWLP-22News TV in Springfield**, where the station scheduled a date, honored it without delay, addressed Plaintiff respectfully as **Dr.SHIVA**, and broadcast an in-depth policy interview across television and digital platforms. **(Exhibit E)**
- Similarly, the **Gospel FM Radio Station at Northeastern University** and numerous independent podcasters conducted live, long-form spoken interviews, treating "interview" as an authentic spoken discussion always addressing Plaintiff as Dr.SHIVA.

None of these organizations invented 49-day delays, none asked about nonexistent "state senate" seats, and none claimed an interview was "unworkable." *The Belmont Voice* did so because it is operating as an establishment gatekeeper while being a well-funded entity with assets exceeding $500,000. (Exhibit D)

## V. DEFENDANTS' BREACH WAS ROOTED IN BAD-FAITH INTENT, RACIAL DISPARATE TREATMENT, AND UNLAWFUL PRETEXT UNDER 42 U.S.C. § 1981

Under *42 U.S.C. § 1981*, all persons within the jurisdiction of the United States possess the same right to make and enforce contracts, guaranteeing full and equal benefit of all laws and proceedings for the security of persons and property. Furthermore, under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing, barring either party from acting in bad faith to destroy or injure the right of the other party to receive the fruits of the contract. The record demonstrates that Defendants entered into the August 26 agreement to "setup interview" with bad-faith intent, executing an intentional stall designed to deny a prominent candidate of color the identical contractual standing accorded to white establishment candidates:

**1. The Core Disparate Treatment: Two Standards for Two Races -** The contractual disparity between the white candidates and Dr.SHIVA is objective and stark:

- The White Candidates (Markey and Deaton): Defendants afforded white candidates live, long-form, spoken interviews. For Republican candidate John Deaton, Defendants actively organized a multi-newsroom syndicate pooling camera crews and resources across six municipalities to produce an hour-long production, treating his campaign time with explicit commercial deference (Opp. at 14–15).
- The Candidate of Color (Dr.SHIVA): For Dr.SHIVA - a dark-skinned immigrant of Indian origin, holder of four MIT degrees, the inventor of email, and a longtime Belmont resident living 3,000 feet away - Defendants refused to conduct a live spoken interview. Instead, after 49 days of intentional silence, Defendants relegated him to a 4-question email questionnaire (**Exhibit C**), stripped him of his earned academic title ("Mr." instead of "Dr."), subjected him to an arbitrary 48-hour weekend deadline, demanded the right to censor his words, and insulted his candidacy by inquiring about a nonexistent run for the "state senate."

**2. Racial Stereotyping and Tone Policing as Pretext for Breach -** Under First Circuit precedent (*Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59–61 (1st Cir. 1999)), unlawful discrimination under federal civil rights law encompasses paternalistic stereotypes and double standards. When white candidates or their campaigns aggressively negotiate media access, it is treated as standard political professionalism. When Plaintiff vociferously demanded that Defendants honor their written contractual commitment, Defendants attempted to dismiss his legitimate enforcement of contract rights as "aggressive." Weaponizing pejorative behavioral labels against a minority contractor who insists on full performance is a classic manifestation of discriminatory tone policing - punishing an outspoken person of color for refusing to accept sub-tier contractual treatment.

**3. Selective Polling as Classic Proof of Pretext Under First Circuit Law -** Under *Conward v. Cambridge School Committee*, 171 F.3d 12, 19 (1st Cir. 1999), when a defendant offers shifting, inconsistent explanations for adverse contractual action, those contradictions demonstrate unlawful pretext. Defendant Floyd swears under oath that he demoted Plaintiff to a questionnaire because *"from the polls I had seen which had each at near 1% of the vote it appeared there was no serious possibility either candidate would win"* (Floyd Decl. ¶ 6). This post-hoc justification collapses upon the objective record:

- No Polling Condition Precedent Existed: On August 26, 2026, when Floyd agreed "to setup interview," (Exhibit A) he imposed zero polling thresholds or viability conditions. Fabricating an unannounced polling benchmark 49 days later - after early voting had already commenced - is an actionable bad-faith contrivance.
- The Deliberate Disregard of the Non-Partisan UMass Poll: Floyd's assertion that "the polls" - plural in polls - showed 1% is demonstrably false and reveals bad-faith selection bias. Floyd selectively cherry-picked a commercial poll while willfully ignoring the prominent, highly regarded, non-partisan statewide survey conducted by the **UMass Amherst Polling Center**- the gold standard of Massachusetts academic polling -

which documented Dr.SHIVA at 8% overall statewide, and 15% and upward among independents (with reach scaling toward 40%).

- The Pretextual Double Standard: In a multi-candidate field, 8% overall and 15% and upward among independents represents a major federal candidacy with decisive electoral consequence. Floyd deliberately bypassed the objective academic polling of UMass to latch onto an outlier 1% commercial poll precisely because he needed an excuse to justify denying a prominent candidate of color the live spoken interview promised in August, while granting expansive, multi-town syndicate coverage to white establishment candidates.

**4. Sworn Concession of the Regional Syndicate** - Finally, Defendants' own filings destroy their plea of poverty. Defendants openly admit that Floyd participated in a *"joint interview of Republican nominee John Deaton with five other local nonprofit newsrooms - a means of making the interview worth the candidate's time due to the combined circulation of the local outlets..."* (Opp. at 14–15). Defendants cannot plead that resource constraints made walking 10 minutes or driving 3 minutes - 3,000 feet - to interview an eminent Belmont neighbor "unworkable," while simultaneously marshaling camera crews and staff across a six-paper regional syndicate for white establishment candidates. Under settled First Circuit civil rights doctrine, these shifting, contradictory justifications unmask Defendants' breach as an intentional act of unlawful disparate treatment under 42 U.S.C. § 1981.

## VI. CONCLUSION

Defendants made an enforceable promise to **setup an interview** and provide **full, equal coverage**. They stalled for 49 days, coordinated with a multi-paper syndicate to promote the establishment, and executed an actionable bait-and-switch with an insulting questionnaire. Under *Cohen v. Cowles Media*, the First Amendment provides no harbor for broken contracts, promissory fraud, and civil rights violations. Plaintiff respectfully requests that the Court grant his Renewed Motion for an Emergency Temporary Restraining Order and Preliminary Injunction (ECF No. 22), compel Defendants to publish Plaintiff's full, unedited campaign answers with digital homepage parity, and enforce the active litigation hold pending full discovery.

Dated: October 28, 2026

Respectfully submitted,

/s/ Dr. Shiva Ayyadurai

Dr. Shiva Ayyadurai, Plaintiff Pro Se

701 Concord Avenue | Cambridge, MA 02138 | Phone: 857-393-7910 | Email: vashiva@cytosolve.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2026, a copy of the foregoing Reply was served electronically via CM/ECF upon counsel of record:

**Rachel F. Strom**

Davis Wright Tremaine LLP

1251 Avenue of the Americas, 42nd Floor

New York, NY 10020

Email: RachelStrom@dwt.com

/s/ Dr. Shiva Ayyadurai

Dr. Shiva Ayyadurai, Plaintiff Pro Se

701 Concord Avenue | Cambridge, MA 02138 | Phone: 857-393-7910 | Email: vashiva@cytosolve.com