UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DR. SHIVA AYYADURAI,<br><br>Plaintiff,<br><br>v.<br><br>BELMONT NEWS FOUNDATION, INC.; JESSE A. FLOYD; SARAH CAPUTO,<br><br>Defendants. | * * * * * * * * * * * * * | Civil Action No. 1:26-cv-14760-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Currently before the Court is Plaintiff Dr. Shiva Ayyadurai's ("Ayyadurai") renewed motion for a temporary restraining order and preliminary injunction against Defendants Belmont News Foundation, Inc. ("Belmont News"), Jesse A. Floyd ("Floyd"), and Sarah Caputo ("Caputo") (collectively, "Defendants"). [ECF No. 22]. For the following reasons, the motion is **DENIED**.

## I. BACKGROUND

### A. Factual Background

The Court previously recounted aspects of the factual background of this case in connection with its original Memorandum Opinion concerning the dismissal of Ayyadurai's original claims. [ECF No. 25]. It will repeat that description here as relevant. Except as otherwise noted, the following facts are undisputed.

Ayyadurai is an independent candidate for United States Senate in Massachusetts, [ECF No. 21 ("First Amended Complaint" or "FAC") ¶ 3].[1] Belmont News is a non-profit news organization based in Belmont, Massachusetts, which publishes The Belmont Voice, a local newspaper. [ECF No. 19 ¶ 1, 3]. Floyd and Caputo are two individuals employed by Belmont News. [FAC ¶¶ 5–6]. In August 2026, Ayyadurai contacted Belmont News to inquire about its general election candidate coverage. [ECF No. 19 ¶ 7]. Floyd, Belmont News's editor in chief, replied to the email on August 26, 2026, stating, in relevant part, "Tuesday is a primary election, and our coverage was focused on candidates facing primary challenges. When we get to the general election, our coverage will expand to include other candidates." [ECF No. 21-1]. Ayyadurai responded the same day, stating, "Sounds good" and providing campaign contact information to set up an interview. [Id.]. Shortly thereafter, Floyd sent another email, stating, "Thanks much. It will be a week or a bit longer after the primary for us to get sorted." [Id.].

Ayyadurai asserts that, as a result of this representation, his campaign staff "halted active street leafleting outside the local Belmont grocery store and pulled volunteer field organizers entirely out of Belmont." [FAC ¶ 18]. According to a declaration submitted by one of his campaign staffers, Ayyadurai's campaign maintains an "established, routine practice" whereby the campaign ceases on-the-ground operations in a given area whenever it "secures dedicated media coverage" in that area. [ECF No. 21-2 ¶ 3].

Defendants did not reach out to Ayyadurai over the following month. [FAC ¶ 23]. During this time, Belmont News, in conjunction with several other Boston-area local

[1] Because Ayyadurai verified the FAC pursuant to 28 U.S.C. § 1746, [FAC at 16], the Court will treat the allegations therein, to the extent they assert facts within Ayyadurai's personal knowledge, with the evidentiary weight of averments in a declaration.

newspapers, participated in an interview of John Deaton, the Republican candidate for United States Senate in Massachusetts, resulting in an article that was published in The Belmont Voice. [Id. ¶¶ 20–21].

On the evening of September 25, 2026, upon learning about the interview with John Deaton, Ayyadurai sent a follow-up email to Floyd repeating his request to be interviewed for The Belmont Voice. [ECF No. 1 at 5].[2] Just over an hour later, Ayyadurai sent another email, copying counsel, in which he stated that he was "writing to formally escalate The Belmont Voice's failure to schedule an interview for my U.S. Senate campaign." [Id. at 6]. Over several paragraphs, he asserted that Defendants had acted with "sloppiness or blatant malevolence," had excluded Ayyadurai's campaign based on racial animus, and had violated federal tax law by "[d]eploying tax-exempt assets to profile party candidates while delaying equal exposure for a local independent candidate." [Id.]. Ayyadurai closed the email by stating that he would "file an emergency complaint for Injunctive Relief in Massachusetts Superior Court" if Defendants did not schedule his interview to occur within the next five days. [Id.].

The next day, Caputo responded to Ayyadurai's emails, stating, "Our editorial team is planning further coverage of this race and does plan to include your campaign in that coverage. They'll be in touch as their reporting progresses." [ECF No. 1 at 7].

Two days later, on September 28, 2026, Ayyadurai sent another lengthy email to Defendants with the subject line "Racist 'Belmont Voice' Must Be Punished for Violating

[2] Although the original complaint has been superseded by the First Amended Complaint, the admissions and exhibits therein still retain evidentiary significance. See Wiseman v. Reposa, 463 F.2d 226, 227 (1st Cir. 1972) ("As a matter of pleading, the original complaint ha[s] disappeared. As an admission against interest, it ha[s] not.").

Multiple Federal Laws." [ECF No. 1 at 8]. Over seven paragraphs, he called Defendants "racist scumbags," accused them of "hypocrisy," "corruption," "intentionally violat[ing] the law," and "violat[ing] [his] Civil Rights," and stated, "You have broken the Law and you must be punished." [Id.]. He concluded the email: "Fuck you and the Belmont Voice." [Id.].

Just over two weeks later, on October 14, 2026, Floyd sent Ayyadurai another email, stating, "[W]e are working on a piece about independent candidates on the Nov. 3 ballot," and requesting written answers to four campaign-related questions. [ECF No. 1 at 9]. In the email, Floyd mistakenly referred to Ayyadurai as running for "state senate." [Id.]. Ayyadurai declined to provide answers to the questions. [Id. ¶ 19].

Five days later, Ayyadurai sent another email stating that he was "completing the final package for filing in the United States District Court for the District of Massachusetts" and demanding that Defendants (1) "[p]ublish an expansive, unedited feature profile" of Ayyadurai; (2) "[p]ublish a top-of-page front-page notice" in their newspaper acknowledging Ayyadurai's Senate candidacy and "addressing the failure to provide concurrent non-partisan coverage"; (3) send an email to The Belmont Voice's full subscriber list containing Ayyadurai's "campaign profile and unedited platform"; and (4) maintain Ayyadurai's profile and a video created by his campaign "pinned at the top" of their website through election day. [Id. at 11].

**B. Procedural Background**

Ayyadurai filed his original complaint, [ECF No. 1], and original motion for a temporary restraining order and preliminary injunction, [ECF No. 6], on October 21, 2026. Defendants filed an opposition on October 23, 2026, [ECF No. 18], and the Court held a conference on October 26, 2026, [ECF No. 20]. At the conference, the Court denied Ayyadurai's motion on the record and dismissed his complaint for lack of jurisdiction. [Id.]. The Court subsequently

entered an opinion explaining the reasons it lacked jurisdiction over Ayyadurai's original complaint, which pled only state-law claims. [ECF No. 25].

The same day the Court dismissed Ayyadurai's original claims, Ayyadurai filed the First Amended Complaint, adding several federal claims, [FAC], as well as the present renewed motion for a temporary restraining order and preliminary injunction, [ECF No. 22]. In his renewed motion, Ayyadurai asks for an order compelling Defendants to, inter alia, "immediately publish Plaintiff's written answers" to the questions posed in Floyd's October 14, 2026, email. [Id. ¶ 4]. Defendants filed an opposition to the renewed motion on October 27, 2026, [ECF No. 26], and Ayyadurai filed a reply brief on October 28, 2026, [ECF No. 28].

## II. LEGAL STANDARD

Preliminary relief under Federal Rule of Civil Procedure 65[3] is an "extraordinary and drastic remedy" that "is never awarded as of right." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). In deciding whether to grant such relief, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing

---

[3] Ayyadurai's motion seeks both a temporary restraining order and a preliminary injunction. [ECF No. 22]. Because "Courts apply the same standard in assessing" both forms of relief, and the Court is considering the motion "follow[ing] full briefing and the opportunity to be heard by the Court," it evaluates the requests together. Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (citing Wash. Tr. Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 217 (D. Mass. 2022)).

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). The moving party bears the burden of establishing each of the four elements. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

These four factors "are not entitled to equal weight in the decisional calculus." Corp. Techs., 731 F.3d at 9. Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10 (quoting Ross-Simons of Warwick, 102 F.3d at 16). "[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). Unless the movants can "demonstrate that [they are] likely to succeed in [their] quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., 287 F.3d at 9).

## III. DISCUSSION

Ayyadurai's First Amended Complaint asserts seven claims: (1) violations of 42 U.S.C. § 1981; (2) violations of 42 U.S.C. § 1985; (3) violations of 42 U.S.C. § 1983; (4) breach of contract; (5) promissory estoppel; (6) breach of the implied covenant of good faith and fair dealing; and (7) violations of Mass. Gen. Laws ch. 93A.[4] [FAC ¶¶ 32–66]. Based on the record before the Court, Ayyadurai falls short of showing a likelihood of success on the merits of any of these claims.

[4] The First Amended Complaint also contains a "count" titled "Substantial Embedded Federal Question Under 28 U.S.C. § 1331," [FAC ¶¶ 47–50], but it does not appear to assert a cause of action and instead merely asserts a basis for jurisdiction over Ayyadurai's state law claims, which are pled in separate counts. The Court will therefore ignore this "count."

**A. 42 U.S.C. § 1981**

42 U.S.C. § 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). To prevail on a claim under § 1981, Ayyadurai "must show that (1) [he] is a member of a racial minority; (2) [Defendants] discriminated against [him] on the basis of [his] race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts." John B. Cruz Constr. Co. v. Beacon Cmtys. Corp., 169 F.4th 89, 99 (1st Cir. 2026) (quoting Hammond v. Kmart Corp., 733 F.3d 360, 362 (1st Cir. 2013)). "Any § 1981 claim . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006) (citation omitted). Ayyadurai's § 1981 claim fails on multiple grounds.

First, although he purports to base his § 1981 claim on a racially motivated contract violation, see [FAC ¶¶ 36–37], he fails to "identify an impaired 'contractual relationship' under which [he] has rights." Domino's Pizza, 546 U.S. at 476 (citation omitted). Under Massachusetts law, "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000). "[A]lthough an exchange of e-mail communications can constitute a contract under Massachusetts law," the terms of such a contract "must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." Gibson Found., Inc. v. Norris, 88 F.4th 1,

12 (1st Cir. 2023) (first citing Fecteau Benefits Grp., Inc. v. Knox, 890 N.E.2d 138, 145 (Mass. App. Ct. 2008); and then quoting Cygan v. Megathlin, 96 N.E.2d 702, 703 (Mass. 1951)).

Here, nothing about the email exchanges recounted in any of Ayyadurai's filings indicates that any contractual relationship was ever formed or even contemplated. The purported offer underlying the alleged contract is a single line in an email from Floyd stating, "When we get to the general election, our coverage will expand to include other candidates." [FAC ¶¶ 12–14]. No reasonable person would construe this general and broadly worded statement—contained in a casual email responding to a question about the newspaper's coverage—as a contractual offering with "definite and certain" terms concerning media coverage of Ayyadurai's campaign. Gibson, 88 F.4th at 12. Nor would any reasonable person infer from it a "present intention to be bound" in a contractual relationship. Situation Mgmt. Sys., 724 N.E.2d at 703. Ayyadurai's § 1981 claim therefore fails.[5]

Second, Ayyadurai presents no evidence that persuades the Court he is likely to succeed in showing racial discrimination. To succeed on this element, Ayyadurai must show that Defendants would have abided by or entered a contractual relationship with him "but for" his race. Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 331–32 (2020). Ayyadurai bases his assertions of discriminatory animus on the fact that Defendants interviewed another Senate candidate who was white, [FAC ¶¶ 22, 26], called Ayyadurai "Mr." rather than

---

[5] Although liability under § 1981 may also arise "when racial discrimination blocks the creation of a contractual relationship," Domino's Pizza, 546 U.S. at 476, Ayyadurai did not plead such a theory in his First Amended Complaint, see [FAC ¶¶ 36–38], and there is no evidence in the record that providing the media coverage Ayyadurai sought from Defendants would have involved a contractual relationship, or that a contract would have been a prerequisite for such coverage.

"Dr.," [id. ¶ 26], and described his actions toward them as "aggressive," [id. ¶¶ 28–29]. None of these facts, however, alone or in combination, plausibly suggest that Defendants would have provided Mr. Ayyadurai the coverage he seeks if he were a different race.

Indeed, having reviewed the numerous emails Ayyadurai sent Defendants—in which he called them "scumbags," [ECF No. 1 at 8]; accused them of "blatant malevolence," "hypocrisy," and "corruption," [id. at 6, 8]; declared they "must be punished," [id. at 8]; and exclaimed, "Fuck you and the Belmont Voice," [id.]—the Court finds Defendants' characterization of the emails as "aggressive" to be entirely accurate, such that the Court cannot infer racial animus from it. Accordingly, the Court finds that Ayyadurai is unlikely to succeed on his § 1981 claim.

**B. 42 U.S.C. § 1985**

To succeed on his § 1985 claim, Ayyadurai must show (1) "a conspiracy"; (2) "a conspiratorial purpose to deprive [him] of the equal protection of the laws"; (3) "an overt act in furtherance of the conspiracy" by Defendants; and (4) "either injury to person or property, or a deprivation of a constitutionally protected right." Parker v. Landry, 935 F.3d 9, 17–18 (1st Cir. 2019) (quoting Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)). "The language requiring intent to deprive of equal protection . . . means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

Ayyadurai contends that Defendants participated in a conspiracy by engaging in a joint interview of John Deaton with several other Boston-area newspapers while "executing a coordinated blackout against Plaintiff[]." [FAC ¶ 41]. He offers no evidence to support his claim that such a conspiracy ever existed, much less that "the purpose of the conspiracy [was] 'to deprive the plaintiff of the equal protection of the laws.'" Does 1-6 v. Mills, 16 F.4th 20, 37 (1st

Cir. 2021) (quoting Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021)). For the reasons described above, see supra Part III.A, nothing in the record before the Court indicates that Defendants acted with "racial, or perhaps otherwise class-based, invidiously discriminatory animus." Griffin, 403 U.S. at 102. That absence dooms Ayyadurai's § 1985 claim.

Ayyadurai's § 1985 claim is also unlikely to succeed for the additional reason that it is likely barred by the First Amendment. The essence of the claim is that Defendants conspired to deprive Ayyadurai of coverage in The Belmont Voice. [FAC ¶ 41]. "The choice of material to go into a newspaper," however, as well as its "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" subject to First Amendment protection. Mia. Herald Pub. Co. v. Tornillo, 418 U.S. 241, 258 (1974). Ayyadurai correctly notes that this principle does not bar claims involving "promises that would otherwise be enforced under state law," [ECF No. 23 at 7 (quoting Cohen v. Cowles Media Co., 501 U.S. 663, 672 (1991))], but this argument has no bearing to claims like Ayyadurai's § 1985 claim, through which he attempts to impose content-based obligations on Defendants independent of any alleged promises made by them. Accordingly, Ayyadurai is unlikely to succeed on his § 1985 claim.

**C. 42 U.S.C. § 1983**

"To prevail on a § 1983 claim, the plaintiff must demonstrate (1) conduct by a person, (2) acting under color of state law, (3) who caused (4) a deprivation of the plaintiff's federally protected rights." Hewes v. Pangburn, 162 F.4th 177, 190 (1st Cir. 2025) (citing West v. Atkins, 487 U.S. 42, 48 (1988)). Where "challenged conduct cannot be classified as state action, a section 1983 claim necessarily fails." Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 543 (1st Cir. 2021). "The traditional definition of acting under color of state law requires that

the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Pike v. Budd, 133 F.4th 74, 83 (1st Cir. 2025) (citation modified) (quoting West, 487 U.S. at 49).

Ayyadurai's § 1983 claim fails because the action he challenges is plainly that of private actors, not state actors. Defendants are a private non-profit news corporation and two of its employees. They exercise no "power possessed by virtue of state law," Pike, 133 F.4th at 83 (quoting West, 487 U.S. at 49), and the conduct at issue was "unaided by any indicia of actual or ostensible state authority," id. (quoting Martinez v. Colon, 54 F.3d 980, 986–87 (1st Cir. 1995)). Ayyadurai's bald assertion that Belmont News is a state actor because of "public entwinement," [FAC ¶¶ 44–46], is supported by nothing more than labels and jargon that fall well short of establishing state action.

Ayyadurai's § 1983 claim is also unlikely to succeed because it is likely barred by the First Amendment, for the reasons discussed above in relation to Ayyadurai's § 1985 claim, see supra Part III.B. Like that claim, Ayyadurai's § 1983 claim attempts to impose content-based obligations which involve "[t]he choice of material to go into a newspaper" and a media outlet's "treatment of public issues and public officials," Tornillo, 418 U.S. at 258, and which are independent of any "promises that would otherwise be enforced under state law," Cowles, 501 U.S. at 672. Accordingly, Ayyadurai has not shown a likelihood of success on his § 1983 claim.[6]

---

[6] This claim also fails for the additional reason that Ayyadurai does not show a deprivation of any federally protected right. Even if Belmont News were a state actor and his claims were not barred by the First Amendment, Ayyadurai has not shown that any provision of the Constitution or federal law would entitle him to the precise media coverage he desires on the precise timeline he desires.

**D. Breach of Contract**

"To prevail on a breach of contract claim under Massachusetts law, [Ayyadurai] must demonstrate that 1) a valid contract existed, 2) [D]efendants breached the terms of that contract and 3) [he] sustained damages as a result." Distefano v. Bank of Am., N.A., 822 F. Supp. 3d 168, 173 (D. Mass. 2026) (citing Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007)).

For the same reasons discussed in detail in connection with Ayyadurai's § 1981 claim, see supra Part III.A, Ayyadurai has not demonstrated that he is likely to succeed in showing that "a valid contract existed." Distefano, 822 F. Supp. 3d at 173. As explained above, no reasonable person would construe Defendants' casual and broadly worded email statements as evincing a "present intention to be bound," Situation Mgmt. Sys., 724 N.E.2d at 703, or offering the "definite and certain" terms necessary for a binding contractual relationship regarding media coverage of Ayyadurai's campaign, Gibson, 88 F.4th at 12. Therefore, Ayyadurai is not likely to succeed on his breach of contract claim.[7]

**E. Promissory Estoppel**

"In Massachusetts, a promissory estoppel claim 'is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.'" John B. Cruz Constr, 169 F.4th at 97 (quoting Neuhoff v. Marvin Lumber & Cedar Co., 370 F. 3d 197, 203 (1st Cir. 2004)). Thus, "to succeed on this claim, [Ayyadurai]

[7] For the same reasons, Ayyadurai's claim for breach of the implied covenant of good faith and fair dealing, [FAC ¶¶ 60–62], is also unlikely to succeed. "[I]f no contract exists, 'there can be no derivative implied covenant of good faith and fair dealing' claim." John B. Cruz Constr. Co. v. Beacon Communities Corp., 169 F.4th 89, 99 (1st Cir. 2026) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005)).

would have to demonstrate an 'agreement between the parties on the material terms,' beyond 'expectations and negotiations.'" Id. (quoting Lambert v. Fleet Nat'l Bank, 865 N.E.2d 1091, 1095 (Mass. 2007)).

For the reasons discussed above in relation to Ayyadurai's § 1981 and breach of contract claims, see supra Parts III.A, III.D, there was no agreement between the parties on any material terms relating to media coverage of Ayyadurai's campaign. Moreover, even if Defendants' words could somehow be construed as a definite promise of coverage, the record indicates that Defendants were fully prepared to offer such coverage, and that it was Ayyadurai who rejected their offer because it did not conform with his desired timeline and scope. [ECF No. 1 ¶ 19]. Ayyadurai's promissory estoppel claim is therefore unlikely to succeed.

**F. Mass. Gen. Laws ch. 93A**

To succeed on a claim under ch. 93A, a plaintiff must show that: "(1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 16 (1st Cir. 2021).

Ayyadurai contends that Defendants' failure to provide his desired coverage of his campaign is an "unfair and deceptive business practice" under ch. 93A, [FAC ¶ 65], but he does not explain how or why that is the case. Contrary to Ayyadurai's assertion, the Massachusetts Supreme Judicial Court has held that "the publication and sale of newspapers is a private enterprise as distinguished from a business affected with a public interest and that those engaged in such a business are free to deal with whomever they choose.'" PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 916 (Mass. 1975) (quoting J. J. Gordon, Inc., v. Worcester

Telegram Publ'g. Co., 177 N.E.2d 586, 588 (Mass. 1961)). It has further held that "a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under [ch.] 93A, and is therefore not actionable." Id. at 919. Accordingly, claims like Ayyadurai's appear barred by Massachusetts precedent.

Moreover, Ayyadurai's ch. 93A claim, like his § 1985 and § 1983 claims, is likely barred by the First Amendment. The essence of this claim is that Defendants' editorial decisions about which candidates to cover and not cover are "unfair and deceptive." As discussed previously in this order, see supra Parts III.B, III.C, such claims which attempt to impose content-based editorial obligations on a newspaper, and which are not attempting to enforce a promise made by that newspaper, are barred under Tornillo, 418 U.S. at 258, and are not saved by Cowles, 501 U.S. at 672. Ayyadurai is therefore unlikely to succeed on his ch. 93A claim.

* * *

In sum, Ayyadurai has not shown a likelihood of success on the merits of any of his claims. The Court therefore "need not address the remaining three preliminary injunction factors." Hum. Rts. Def. Ctr. v. Bd. of Cnty. Comm'rs. for Strafford Cnty., 654 F. Supp. 3d 85, 100 (D.N.H. 2023) (citing LeBeau v. Spirito, 703 F.2d 639, 645 (1st Cir. 1983)). Ayyadurai is not entitled to relief under Rule 65.

## IV. CONCLUSION

For the foregoing reasons, Ayyadurai's renewed motion for a temporary restraining order and preliminary injunction, [ECF No. 22], is **DENIED**.

**SO ORDERED.**

October 28, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE